# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3118

_____

United States of America,      *
                                            *

         Plaintiff-Appellant,      *

                                          *    Appeal from the United States
    v.                                     *    District Court for the Southern
                                          *    District of Iowa.

Norma Hernandez,               *

                                            *
         Defendant-Appellee.      *

_____

Submitted: May 14, 2002

Filed:    September 9, 2002

_____

Before WOLLMAN, BRIGHT, and GIBSON, Circuit Judges.

_____

BRIGHT, Circuit Judge.

After a jury convicted Norma Hernandez of aiding and abetting the possession with intent to distribute methamphetamine, the district court[1] granted Hernandez's motion for judgment of acquittal. The government appeals, arguing that it presented

_____

[1]The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa.

sufficient evidence at trial to allow a reasonable jury to find Hernandez guilty beyond a reasonable doubt.

## I. BACKGROUND

Through an undercover informant, police purchased methamphetamine three times from a man named Jaime Marin. On February 12, 2001, the date of the third and final exchange, Marin told the informant that he had to wait until his methamphetamine delivery arrived before he could complete the transaction. Shortly thereafter, Elisandro Garcia-Melchor and Norma Hernandez arrived at Marin's residence in a white Chevrolet Cavalier. According to the police officer conducting surveillance of the house, Garcia-Melchor went between the house and the car two or three times.[2] After Garcia-Melchor and Hernandez departed, Marin delivered two pounds of methamphetamine to the informant. The police then arrested Marin and took Garcia-Melchor and Hernandez into custody for questioning. Police seized a cellular telephone from the Cavalier. The phone was registered in Hernandez's name.

Marin, Garcia-Melchor, Hernandez, and others were indicted in United States District Court for the Southern District of Iowa on charges of conspiracy to distribute methamphetamine pursuant to 21 U.S.C. § 846 and possession with intent to distribute methamphetamine pursuant to 21 U.S.C. § 841(a)(1). Marin and Garcia-Melchor pled guilty to various charges.[3] The government filed a second superseding

---

[2]The police officer who interviewed Hernandez testified that Hernandez told him that Garcia-Melchor got out of the vehicle and told her to drive around to the back of the house, which she did. However, the police officer conducting the surveillance explicitly stated that he did not recall anyone moving the car or turning it around during the approximately thirteen minutes it was parked outside Marin's residence.

[3]The government charged that there were five members of the drug conspiracy, including Marin, Garcia-Melchor, and Hernandez. Three of the five pled guilty, and

indictment charging Hernandez with two counts: conspiring to distribute methamphetamine in violation of 21 U.S.C. § 846 and aiding and abetting the possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2.

At Hernandez's trial, the government presented several items seized from Hernandez's residence at 2423 23rd Avenue in Moline, Illinois, which it considered evidence of Hernandez's involvement in the methamphetamine conspiracy. In the kitchen of the residence, police found a digital scale commonly used to weigh drugs. An officer who searched the residence testified that the scale was located high up in a kitchen cabinet; the officer had to reach above his head to retrieve it. Also in the kitchen, the officers found plastic wrap "nearly identical" to the type used to package some of the methamphetamine purchased in the undercover operation. Officers found receipts for cars purchased in Hernandez's name and $14,100 cash under a bed in the residence. The government traced $4500 of that money back to serialized funds used in the undercover operation.

The government also offered the cellular telephone registered in Hernandez's name as evidence of her involvement in the conspiracy.[4] According to Hernandez's statements to officers after her arrest, although the subscriber agreement was in her name, the phone belonged to Garcia-Melchor. The government called the cellular phone sales agent who testified that she sold a cellular phone and prepaid minute cards for the phone to Garcia-Melchor and Hernandez. The sales agent also testified that every cellular phone subscriber agreement must include the subscriber's social

---

Hernandez and another defendant, Jose Duran, went to trial. In a separate proceeding, a jury found Duran not guilty of any charges.

[4]Records for the cellular phone established that between August 6, 2000, and February 12, 2001, the phone was used to make 170 calls to Marin. The government never attempted to prove that Hernandez herself made any of these calls.

security number. On the phone subscriber agreement, Hernandez provided her correct name, social security number, and birth date. However, according to the government, Hernandez provided a nonexistent address on the subscriber agreement.

The address Hernandez provided in the subscriber agreement was 4066 8th Avenue, Silvis, Illinois. Hernandez had given the address 406 8th Avenue, Silvis, in certain wire transfers she made to Mexico. Hernandez, on three occasions, wired a total of $2,600 to Mexico.[5]

Evidence introduced at trial proved that Hernandez did not rent the house at 2423 23rd Avenue, Moline, until August 18, 2000, and she did not move in until September 6, 2000. Therefore, she was not residing at this location when she signed the subscription agreement on July 23, 2000. A government witness, Agent Tani Fiems, testified that 4066 8th Avenue does not exist, but the agent admitted there is a 406 8th Avenue. The agent reported that the names on the mailbox of this address were Judy and Royce Edwards. The government did not offer any evidence about whether or not the Edwards were connected to Hernandez, whether she had ever lived there, or whether she was authorized to use that address. The government did not produce Royce or Judy Edwards.

---

[5]While searching the residence, officers found a business card from "Order Express" with the name Norma Hernandez on it. Claudia Lara, an employee of Order Express, testified at trial and identified invoices from Order Express showing that Hernandez wired money to Mexico on three separate occasions in 2000: $1500 to Mexico on November 30, 2000; $200 to Mexico on December 4, 2000; and $900 to Mexico on December 7, 2000. Each invoice listed Hernandez's address as 406 8th Avenue in Silvis. The government did not establish when Hernandez first provided her address to Order Express. Lara simply testified: "The first time when they arrive, they give us their address, but they never give us any identification, because we don't need identification." (Tr. 142).

Candido Vicuna, the owner of Sands Auto Sales in Moline, testified for the government. Although it is somewhat unclear in the record, it appears that around September 2000,Vicuna sold Hernandez and Garcia-Melchor a 1990 Toyota 4-Runner, which Garcia-Melchor subsequently sold for profit, and then seven days later Vicuna sold Hernandez and Garcia-Melchor a 1991 Chevy Lumina. A month later, Garcia-Melchor returned the Lumina, according to Vicuna, "because Norma didn't like that vehicle. She liked the '91 Cutlass Supreme." (Tr. 154). Vicuna stated that Garcia-Melchor negotiated the purchase of these vehicles, but Hernandez was present. Vicuna testified that he communicated with Garcia-Melchor in Spanish because Garcia-Melchor did not speak English. Vicuna specifically told Hernandez to fill out the purchase documents and told her to put her name on the papers because it would be easier for her to get insurance and a driver's license.

The government called Mary Callahan, an employee of Premiere Properties, to testify. Callahan rented the residence at 2423 23rd Avenue in Moline to Norma Hernandez and another person identified as Jesus Aranda. Callahan testified that Aranda paid for the rent each month, and sometimes paid several months in advance. According, to Callahan's testimony, "Jesus spoke English. Norma spoke a little English also," and Callahan never had difficulty communicating with Aranda. (Tr. 126-28).[6]

The police's undercover informant, Mark Ockenfels, who made the controlled purchases from Jaime Marin, testified that he did not know Hernandez, had never seen her before, and had no knowledge of her being involved in any way with Jaime

[6]On the other hand, the Sands Auto Sales owner, Vicuna, testified that he was certain Garcia-Melchor did not speak any English. Although there are intimations, it is not clear from the record or the government's brief whether or not the government believes Aranda to be Garcia-Melchor's alias. The government did not prove that Aranda actually lived at 2423 23rd Avenue, nor did the government prove that he did not live there.

Marin. Agent Pettrone testified that in his interview with Hernandez, he asked her if she suspected that Garcia-Melchor was involved with drugs, and she said that she had never seen him either use or be in possession of any drugs. She said she had never been involved in drugs, either using or dealing, and she said that she would not know drugs if they were put on the table in front of her.

Agent Fiems testified that she interviewed Marin, and he said that Hernandez was present when he and Garcia-Melchor talked about drugs.[7] Marin indicated that he and Garcia-Melchor did not speak in code about the drugs, but Agent Fiems did not elaborate on what was said, how it was said, or when it was said.

At the close of the government's case in chief, Hernandez moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a). Pursuant to Federal Rule of Criminal Procedure 29(b), the court reserved ruling on the motion until after the jury verdict. The jury found Hernandez not guilty of conspiracy but found her guilty of aiding and abetting possession with intent to distribute methamphetamine. The court granted Hernandez's motion for judgment of acquittal. This appeal followed.

## II. DISCUSSION

Under Rule 29(a), a court shall enter a judgment of acquittal if the evidence presented at trial is insufficient to sustain a conviction. Fed. R. Crim. P. 29(a). "In reviewing a judgment granting a motion for acquittal, we view the evidence in the light most favorable to the Government and affirm if a reasonable jury viewing the evidence in this light must have a reasonable doubt about the existence of an essential element of the crime." United States v. Quigley, 53 F.3d 909, 909 (8th Cir. 1995).

---

[7]Defense counsel elicited this hearsay testimony on cross-examination of Agent Fiems. Marin did not testify at Hernandez's trial.

When a district court considers a motion for acquittal, it does so with "very limited latitude" United States v. Thompson, 285 F.3d 731, 733 (8th Cir. 2002) (citations and internal quotations omitted). The court should not assess the credibility of the witnesses or weigh the evidence. Id. In the instant case, the government argues that the district court erred by determining the government did not present sufficient evidence to prove that Hernandez aided and abetted the possession with intent to distribute methamphetamine.[8] We disagree.

To convict Hernandez of aiding and abetting the possession with intent to distribute methamphetamine, the government had to prove beyond a reasonable doubt that Hernandez: (1) associated herself with the unlawful venture; (2) participated in it as something she wished to bring about; (3) sought by her actions to make it succeed; and (4) shared the criminal intent of the principal. United States v. Brownlee, 890 F.2d 1036, 1038 (8th Cir. 1989).

The district court found that there was enough evidence to permit "a reasonable person to conjecture that defendant knew what was going on and in some fashion assisted Mr. Garcia-Melchor in committing the crime." (App. A-10). However, mere conjecture is not enough to overcome the burden of reasonable doubt.

The district court granted Hernandez's motion for judgment of acquittal based on a number of factors, including: (1) no direct evidence that Hernandez ever knew that Garcia-Melchor possessed methamphetamine or delivered methamphetamine to Marin or anybody else; (2) no direct evidence that Hernandez knowingly acted in any

---

[8]In its brief, the government argues that Hernandez did not merely aid and abet, but the evidence is sufficient to prove that she actually possessed methamphetamine with intent to distribute the drug. However, in the second superseding indictment, the government specifically limits the allegation against Hernandez to aiding and abetting the possession with intent to distribute methamphetamine. Therefore, we will restrict the scope of our review to the government's argument on this charge.

way for the purpose of aiding Garcia-Melchor in committing the crime of possession with intent to distribute or that she intended that methamphetamine be delivered to another person or persons; (3) no evidence that Hernandez was more than merely present at the scene of a criminal event; and (4) all of the circumstantial evidence offered by the government, including the fact that the cellular phone and the car were in Hernandez's name, Hernandez wired money to Mexico, and the police's discovery of money, a scale, and plastic wrap in the home Hernandez shared with Garcia-Melchor, leads only to conjecture of guilt, not an inference of guilt, reasonably drawn from the facts. As the district court explained, "conjecture is something less than an inference reasonably drawn from the evidence." (App. A-9) (citing Watson v. Nix, 551 F. Supp. 1, 12 (S.D. Iowa 1982), aff'd without opinion, 696 F.2d 1000 (8th Cir. 1983)); see also United States v. Campbell, 702 F.2d 262, 267 (D.C. Cir. 1983) ("Guilt, according to a basic principle in our jurisprudence, must be established beyond a reasonable doubt[, a]nd, unless that result is possible on the evidence, the judge must not let the jury act; he must not let it act on what would necessarily be only surmise and conjecture, without evidence.") (internal quotation marks and citations omitted).

The government argues that the evidence was sufficient to establish that Hernandez "played an integral role in the offense." However, even the most compelling facts presented by the government do not clear the hurdle of reasonable doubt, and each of the government's inferences based on conjecture can be refuted.

At most, the evidence presented by the government was sufficient to show the following. Hernandez and Garcia-Melchor lived together from the summer of 2000 until February 12, 2001. Beginning on November 1, 2000, and continuing until February 12, 2001, Garcia-Melchor sold and delivered methamphetamine to Marin. On two or three occasions prior to February 12, 2001, Hernandez accompanied Garcia-Melchor on these trips. She was present when Marin and Garcia-Melchor talked about drugs. On February 12, 2001, Garcia-Melchor and Hernandez traveled

-8-

to Marin's residence in a vehicle registered to Hernandez. Before their arrival, Marin claimed he did not have drugs, but after they left, Marin told the police's informant that he had drugs and later delivered them.[9] Hernandez stayed in the car and she claims to have moved the vehicle to the rear of Marin's residence at Garcia-Melchor's instigation.

The government argues that Hernandez aided and abetted Garcia-Melchor by providing a place for him to live and store drug-related items. The police found incriminating items in Hernandez's residence: a scale that could be used to weigh drugs, plastic wrap similar to that used to wrap the methamphetamine purchased in the undercover operation,[10] and the serialized money from the drug purchases. However, the government was unable to show that Hernandez ever had contact with these items or that she even knew about the existence of the scale, packing material, and money. Digital scales like the one found in the kitchen can be purchased in local stores and are not illegal. The officers found the scale on the "second to top" shelf and the agent who discovered it had to reach above his head to retrieve the scale. The government did not show that the scale was in plain view or that it was mixed with commonly used household items or items that belonged to Hernandez. The government could not show that the plastic wrap was the *same* plastic wrap used to

---

[9]In her brief, Hernandez challenges the government's assertion that Garcia-Melchor actually delivered drugs to Marin on February 12, 2001, based on the following facts. The surveillance officer did not see Garcia-Melchor carry anything into the house. The informant's drug buy from Marin did not occur until over an hour after Garcia-Melchor and Hernandez left. Additionally when the police arrested Garcia-Melchor and Hernandez after they left Marin's, the police found no drugs or money on either of them.

[10]We note that when the police searched Hernandez's kitchen, they were unable to find any of the other items, such as sandwich bags or foil, that were also used to package the drugs purchased in the undercover operation.

wrap the drugs; all the officer could say was that it was *similar to* the type used. The $14,000 in cash found between the box spring and mattress was only about half an inch thick and not visible. The government did not prove that Hernandez slept on the bed where the cash was uncovered, nor did it connect the money in any way to Hernandez.

The government cites United States v. LaGuardia, 774 F.2d 317, 319 (8th Cir. 1985), to support its theory that Hernandez aided and abetted Garcia-Melchor by providing the place where the drug proceeds were concealed and where scales and packaging materials were kept. The facts of LaGuardia reveal that Gato, LaGuardia's girlfriend, was the lessee of an apartment in which she lived with LaGuardia. The police found cocaine in the bedroom closet and in two locations in the kitchen among household goods and appliances. Drug paraphernalia, including scales, were found in common areas of the bedroom and kitchen. Id. at 318. Almost $10,000 in cash was found in a bedroom dresser drawer, hidden among clothing. Additionally, a loaded firearm and a knife were found in Gato's purse. In the present case, no drugs were found on Hernandez's property and the questionable materials (money, packing material, and a scale) are perfectly legal. Furthermore, these items were not in plain view.

As Hernandez argues, the instant case is much more like United States v. Ward, 703 F.2d 1058 (8th Cir. 1983), where a judgment of acquittal was affirmed. Rose, Ward's girlfriend, was living with Ward, her car was used in Ward's marijuana-growing operation, her fingerprints were found on several cups in which marijuana was grown, and she was instructed by Ward at the time of his arrest to call "Loren" and tell him what was going on. We determined that guilt could not be inferred solely from Rose's presence or association with the members of the conspiracy on the basis of these facts. Id. at 1062.

-10-

The government contends that a jury could reasonably infer Hernandez aided and abetted Garcia-Melchor by providing "numerous" vehicles for his use even though Garcia-Melchor purchased them with "large amounts" of cash.[11] The government claims that Hernandez's registration of cars in her name provided Garcia-Melchor with the means of concealing and transporting drugs. However, the district court found that the vehicles used to deliver drugs were purchased long before any known illegal drug transaction. Furthermore, the car dealer instructed Hernandez to put the cars in her name because it would be easier for her to get a driver's license as she spoke English and had a social security number whereas Garcia-Melchor did not. Hernandez also used her true name and true address when she registered the vehicles purchased from Vicuna at Sands Auto Sales.

The government relies on United States v. Simpson, 979 F.2d 1282, 1285 (8th Cir. 1992), for the proposition that providing the means of transportation and concealment of drugs is sufficient to support a conviction. This case is inapposite, however. Simpson based her sufficiency of the evidence argument on her mental state at the time of the robbery: she claimed a defense of coercion based on battered women's syndrome. The court's discussion of means of transportation and concealment arose in regard to whether Simpson possessed the requisite mental state at the time of the crime; there was "no question" that Simpson committed the underlying crime and "all the physical acts necessary to constitute aiding and abetting." 979 F.2d at 1288. Additionally, Simpson had been explicitly told by her boyfriend and later her co-defendant that they were going to rob a bank. The link between Hernandez's physical acts, registering cars in her name and living with

---

[11]The government's brief refers to "numerous vehicles" in Hernandez's name, but the record indicates at most three vehicles: a Toyota 4-Runner that Garcia-Melchor legally resold, a Chevy Lumina that was later returned for a Cutlass Supreme, and the Chevrolet Cavalier that Garcia-Melchor drove to Marin's residence on February 12, 2001. The Toyota cost $4525.00 and receipts introduced indicate payment of $1081.00 for the Lumina and payment of $600 for the Cutlass.

Garcia-Melchor, and the methamphetamine distribution is too attenuated. Her limited actions are not sufficient to establish guilt. Also the government was unable to show that Garcia-Melchor ever told Hernandez anything about his drug operations.

Finally, the government alleges that Hernandez aided and abetted Garcia-Melchor by registering a cellular telephone in her name, thereby allowing Garcia-Melchor to communicate with other members of the conspiracy yet avoid detection by police. The government also contends that the "nonexistent" address Hernandez provided in the subscriber agreement allowed Garcia-Melchor's activities to remain hidden because there was no way to find the owner of the phone.

The government's position strains credulity, however, unless one is willing to accept that, while Hernandez used her true name, birth date, and social security number on the subscriber agreement, she was trying to disguise her identity by adding an extra "6" to the address. The extra digit is the only difference between the address on the cell phone subscriber agreement and the address used by Hernandez to wire money to Mexico. The government offered no evidence that Hernandez did not live at this address or did not have permission to use this address. Nor did the government introduce any evidence as to where Hernandez was living on July 23, 2000, when she signed the cell phone agreement. Garcia-Melchor may have used the phone to conduct drug transactions, but there is no direct or circumstantial evidence that Hernandez knew this.[12]

---

[12]The government makes assorted other arguments on behalf of the guilty verdict. They range from plausible (moving the car to the back of the house she exercised dominion over the car and served as a lookout); to questionable (she lent the appearance of legitimacy to Garcia-Melchor's drug trafficking by traveling with him when he was transporting drugs); to desperate (her statement that she did not know how to get to Marin's residence indicates knowledge and involvement with the drug delivery). As the district court stated, knowing a criminal or knowing that a person is committing a crime does not make one an aider or abettor. Guilt may not be inferred solely on the basis of defendant's presence or association with members

When the government's evidence is viewed in its entirety, Hernandez's activities may be sufficient to raise speculation that she shared Garcia-Melchor's criminal intent. However, there is a critical line between suspicion of guilt and guilt beyond a reasonable doubt. We believe the district court was correct in its assessment. Even looking at the government's case in the most favorable light possible, the government has not transcended the realm of speculation to the realm of certainty beyond a reasonable doubt. There exists insufficient evidence to allow a reasonable jury to find Hernandez guilty beyond a reasonable doubt.

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

_____

of the conspiracy. Ward, 703 F.2d at 1062.

-13-