# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3148

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Arkansas. |
| Rashad Landers, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: April 12, 2005
Filed: August 10, 2005

_____

Before MURPHY, BRIGHT, and MELLOY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Rashad Landers was convicted by a jury of aiding and abetting the distribution and possession with intent to distribute more than 50 grams of crack cocaine, of carrying on his drug offense within 1,000 feet of a public school, and of using a communication facility to commit a drug trafficking offense. Since Landers had two or more prior felony drug offenses, he was subject to a mandatory minimum term of life imprisonment. Landers appeals his convictions and the sentence imposed by the district court.[1] We affirm.

_____

[1]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

The investigation that led to Landers began with the arrest of Theodis Cogshell for check fraud and possession of crack cocaine. Cogshell started cooperating with the Drug Enforcement Administration (DEA) in January 2003 and identified as one of his drug sources a man he knew as Twin. Investigators later ascertained that Landers was that man, and DEA agents went to the address Cogshell supplied for him and conducted a "knock and talk." Dejwan Payne answered the door and admitted the agents. He told them that Natasha Jones lived there. In the house in plain view the agents saw photos of Landers, digital scales, and a large roll of cash on the coffee table. The DEA then established surveillance of the house and observed considerable traffic at that location. They noticed that individuals would frequently go inside for a very short period of time before departing, but that these visits only happened when Landers was at the house. Agents also discovered that one of the two cellular phones used by Landers, the vehicles he drove, and the leasehold of the residence were all in the name of Natasha Jones, who was his girlfriend and the mother of his child.

Agents arranged a controlled buy between Cogshell and Landers. Dejwan Payne answered the phone when Cogshell called, and he passed the call to Landers after Cogshell identified himself. Cogshell arranged to buy two ounces of crack cocaine from Landers at $800 per ounce. When Cogshell arrived at the house he bought the two ounces as arranged and Landers offered to sell him additional quantities at a reduced price. Cogshell declined and told Landers that he was going to "make a lick," meaning that he planned to resell the two ounces he bought for a much higher price. Shortly after Cogshell left the house, agents saw Landers get into a Caprice parked in the driveway. Soon a white van arrived, and the driver approached the Caprice and made a quick hand exchange with Landers and put something into his right coat pocket before getting back into his van and driving away. In the next step of the investigation the agents conducted a "trash pull" at the Jones residence. They retrieved baggies containing whitish rocklike residue, marijuana residue, and white powder residue.

-2-

The agents then applied for and received a search warrant for the Jones residence. They arrived in the vicinity of the house at about 12:30 p.m. on April 4, 2003, but they saw Landers leaving before they had a chance to execute the warrant. He returned at about 4:15, and a few minutes later another man arrived with a brown paper bag. After spending a brief time in the house, the man departed without the bag and was observed putting something into his pocket. Agents moved to execute the warrant at 4:22 p.m., but when the raid van approached, Landers sped away in a car and eluded apprehension. No one else was inside the house. Agents seized a plastic baggy containing approximately one ounce of crack cocaine from a shelf in a hallway closet, digital scales with crack residue on them, and a number of empty baggies. They also observed that one room of the house was littered with crack crumbs. When Landers was finally located at a hotel on May 21, arresting officers had to pry his hand open to force him to relinquish two baggies, each of which contained approximately one gram of crack.

Landers, Jones, and Payne were all indicted on one count of conspiracy to distribute and possess with intent to distribute more than 50 grams of a mixture and substance containing cocaine base, in violation of 21 U.S.C. § 846; one count of aiding and abetting each other in the distribution and possession with intent to distribute more than 50 grams of a mixture and substance containing cocaine base, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and one count of distribution and possession with intent to distribute more than 50 grams of a mixture and substance containing cocaine base within 1,000 feet of Garner Elementary Playground, a public elementary school playground, in violation of 21 U.S.C. §§ 841(a)(1) and 860. Additionally, Landers and Payne were indicted on one count of using a telephone, a communications facility, in committing, causing, and facilitating the distribution of cocaine. Jones and Payne pled guilty to lesser charges, and Landers went to trial.

At trial the case agent from the DEA, John Vannatta, described the investigation. He testified that the crack crumbs found on the floor of the Jones residence were evidence that there was a large amount of drug trafficking taking place, making the loss of a few rocks insignificant. He explained that the two ounces of crack purchased through the controlled buy and the one ounce found during the search were large amounts of crack which were consistent with distribution. The agent also reported that the crack found on Landers when he was arrested had been packaged so that it was ready for distribution in one gram sales. Based on the large number of people going through the house after staying for short periods, the controlled buy, the scales and cash observed during the knock and talk, the items seized under the warrant, the presence of the crack crumbs, and Landers' flight from the raid, the agent concluded that the residence was a crack house.

Cogshell testified that he started buying crack cocaine from Landers in October or November 2002 and bought two to three ounces from him about twice a week. He said he always dealt personally with Landers at the residence and did not buy drugs from anyone else there. Cogshell testified that Payne was usually at the house when he purchased from Landers and that Payne had occasionally been at the table when the transactions took place. Cogshell said that when he wanted to reach Landers he usually called a number which was registered to Marcus Jefferson and Payne would usually answer. When Cogshell called the number registered to Jones, he said that the woman answering would direct him to call Landers at the other number. He testified that Jones was occasionally at the house when he arrived to purchase drugs, but that she would leave as he came in.

The government called a security officer and investigator for the Little Rock School District who was stationed at Garland Elementary School. He testified that students up to the eighth grade attend Garland and that it is part of the Little Rock public school system. He said that the school is within 1,000 feet of the house out of which Landers was selling drugs. The government then recalled Agent Vannatta who

testified that he had measured the distance between the crack house and the school with a traffic wheel used by the police and determined that the school was 600 to 700 feet from the house. After presenting testimony from a DEA chemist and a DEA supervisor, the government rested its case. Landers did not offer any evidence.

Landers moved for a judgment of acquittal on all four counts. He contended that the evidence had not shown a conspiracy between himself and Payne, Jones, or Cogshell, and the district court granted the motion on that count. As to the aiding and abetting count, Landers claimed that there was no evidence that Payne and Jones had been involved in illegal drug activity and that he could not have aided and abetted himself. The government responded that the charge of aiding and abetting was tied to the distribution and possession of crack with intent to distribute in which Landers acted as a principal. The court concluded that a jury could fairly infer from the evidence that Payne was a participant in the drug transactions, and it denied the motion for acquittal on that count. Landers' objection to the third count was that the indictment identified the school within 1,000 feet of the drug transactions as Garner, but the evidence showed that it was actually named Garland. The court denied the motion on the ground that the indictment had given Landers adequate notice of what the charge was. As to the fourth count, Landers argued there was insufficient evidence identifying him as the person communicating on the telephone; the motion was denied.

During jury deliberations the court received a note from the foreperson asking "Why does the verdict form have no school name while the indictment reads Garner?" and "Do we have to consider a typographical or technical error?" The district court answered the jury questions in the following way: "The Court has ruled that the reference in the indictment to 'Garner' was a typographical error." Landers objected that the answer was "a comment on the indictment and the evidence."

Landers was found guilty of all three counts put to the jury. The presentence report (PSR) which had been prepared for the court listed eighteen adult criminal convictions for Landers, including assault, weapons violations, possession of narcotics, and driving while intoxicated. Two of the prior convictions were felony drug offenses (state court convictions in 1998 for possession of cocaine and in 1994 for possession of cocaine with intent to deliver), both of which had been cited in the government's pretrial notice that it would seek a life sentence under 21 U.S.C. § 841(b) (mandating life imprisonment without release upon conviction of possession with intent to distribute more than 50 grams of crack after at least two final prior convictions for a felony drug offense). The PSR concluded that Landers was a career offender under United States Sentencing Guidelines Manual § 4B1.1. This placed him in criminal history category VI with an offense level of 37, resulting in a sentencing range of 360 months to life. The court imposed the mandatory life imprisonment required under 21 U.S.C. § 841(b) for aiding and abetting the distribution and possession with intent to distribute cocaine base. The court also sentenced Landers to 360 months for distributing and possessing with intent to distribute cocaine base within 1,000 feet of a public school and 48 months for using a telephone to commit a drug trafficking offense. All the sentences were to run concurrently. On appeal Landers challenges his convictions on various grounds, as well as his life sentence.

Landers argues that his conviction on the aiding and abetting charge should be reversed because there was insufficient evidence that he aided and abetted the codefendants named in the indictment. The indictment reads in pertinent part: "Rashad Landers, Natasha Jones, and Dejwan Payne, aiding and abetting each other, knowingly and intentionally distributed and possessed with intent to distribute more than fifty (50) grams of a mixture and substance containing cocaine base, a/k/a crack cocaine." Landers contends that Jones and Payne were merely associated with him and that the only aiding and abetting relationship he had was with the informant, Cogshell.

In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the jury verdict and will reverse only if no reasonable jury could have found the defendant guilty. United States v. Ramirez, 350 F.3d 780, 783 (8th Cir. 2003). The question Landers focuses on in his briefing is whether a reasonable jury could have found that Jones and Payne aided and abetted him in the distribution of crack cocaine. The evidence showed that Payne was often present at the house during the drug transactions and that he screened phone calls for Landers. Jones leased and lived at the house which was used for the crack sales, and she provided vehicles and a cellular phone which were used by Landers in the course of his business. The jury heard Landers' arguments about Payne and Jones not being involved in the crack operation, and it was able to consider his points together with all the evidence presented. The instructions to the jury on the aiding and abetting charge were based on § 5.01 of the Eighth Circuit Model Criminal Jury Instructions as cited by the dissent. After reviewing the record, we conclude that there was sufficient evidence from which a reasonable jury could have determined that Payne, Jones, and Landers aided and abetted each other in the crack operation as the indictment charged.

Landers argues that Jones' circumstances mirror those of the girlfriend of a drug dealer in United States v. Hernandez, 301 F.3d 886 (8th Cir. 2002), where we affirmed a judgment of acquittal as to her. Hernandez leased the residence she shared with her boyfriend and gave him access to a car and cellular phone in her name. In that case, however, no drugs were found in her residence and no cash or scale was readily visible. In the present case, agents who were in the house saw in plain view money, scales, and crack crumbs, and the ounce of crack that was seized was in a common area of the house. These circumstances more closely match those found in United States v. LaGuardia, 774 F.2d 317, 319 (8th Cir. 1985), in which we said that "the jury reasonably could find that as the lessee and an occupant of the apartment, she had control of the premises and permitted areas of the home to be used in the concealment of the drugs." In this case, frequent drug transactions took place at the

house Jones leased and where she lived. The informant testified that she was sometimes present when he arrived as a customer, and she supplied Landers with vehicles and a cell phone.

In addition to his claim of insufficient evidence of an aiding and abetting relationship with Payne and Jones, Landers argues that there was a variance between the indictment and the proof offered by the prosecution or, alternatively, that the jury verdict was based on a constructive amendment to the indictment. Since we have concluded that there was sufficient evidence for a jury to find that Landers committed the crime charged in the indictment, we see no merit in these arguments.

Landers raises two challenges to his conviction for distribution and possession with intent to distribute more than 50 grams of cocaine base within 1,000 feet of a public school. First, he argues there was a variance or a constructive amendment of the indictment because it alleged that the drug trafficking took place within 1,000 feet of Garner Elementary School, while the proof presented at trial was that the school's name was Garland. The government responds that the district court correctly regarded the discrepancy as harmless because it was similar to a typographical error which did not affect the defendant's right to notice of the charge. The elements of the offense – distribution and possession with intent to distribute crack cocaine within 1,000 feet of public school property – can be established without reference to the name of the school, and there is no indication in the record that any confusion about the name interfered with Landers' ability to mount a defense. We conclude that the discrepancy concerns the form of the indictment, but not its substance, and the district court's decision to submit the charge to the jury was therefore not erroneous. See United States v. Powers, 572 F.2d 146, 152 (8th Cir. 1978).

Landers' second argument about this count concerns the court's response to the jury questions. He contends that when the court told the jury "The Court has ruled that the reference in the indictment to 'Garner' was a typographical error," it

-8-

improperly commented on the evidence and interfered with the jury's fact finding role. He says that the court decided a fact that the prosecution had neglected to prove. We disagree. The prosecution did not have to prove that the school was named Garner, but only that there was a public school within 1,000 feet of where Landers was distributing and possessing with the intent to distribute crack cocaine. The prosecution presented sufficient evidence regarding the required elements, and we conclude that the court's response did not improperly comment on the evidence or interfere with the jury's role as fact finder.

Finally, Landers argues that his sixth amendment rights were violated when the district court found that he had two or more prior felony drug convictions which mandated a life sentence under 21 U.S.C. § 841(b). He contends that recent Supreme Court decisions, most notably Shepard v. United States, 125 S. Ct. 1254 (2005), have implicitly overruled Almendarez-Torres v. United States, 523 U.S. 224 (1998), which established that facts related to criminal history are sentencing factors for the court rather than facts which must be proven to a jury. Although one justice questioned the continuing validity of Almendarez-Torres in his separate opinion in Shepard, no other justice joined in his discussion. Almendarez-Torres remains the governing law which we must follow. See United States v. Mattix, 404 F.3d 1037, 1038 (8th Cir. 2005). Landers has not shown that his sixth amendment rights were violated.

For these reasons we affirm the judgment of the district court.

BRIGHT, Circuit Judge, concurring in part and dissenting in part.

I concur in affirming Rashad Landers' conviction for drug distribution within 1,000 feet of a school and rejecting Landers' sixth amendment claim. I dissent from the majority's opinion affirming Landers' conviction and mandatory minimum life sentence for aiding and abetting Natasha Jones and Dejuan Payne in, as the indictment reads, "knowingly and intentionally distribut[ing] and possess[ing] with

the intent to distribute more than fifty (50) grams of a mixture and substance containing cocaine base, a/k/a crack cocaine."

The majority misconstrues the law on aiding and abetting by stating and analyzing the wrong question. In beginning the analysis on this issue, the majority states, "The question Landers focuses on in his briefing is whether a reasonable jury could have found that Jones and Payne aided and abetted him in the distribution of crack cocaine." Slip Op. at 7. This is not the question Landers presented on appeal, nor is this the correct question in analyzing a conviction for aiding and abetting another in distributing or possessing with the intent to distribute crack cocaine.

The question Landers raises, and the proper question for this appeal, is: whether a reasonable jury could have found that Landers aided and abetted Jones and Payne in the distribution or possession with the intent to distribute crack cocaine. It very well may be that Jones and Payne aided and abetted Landers. That is not the issue in this case. This issue is whether Landers aided and abetted Jones or Payne.

Section 5.01 of the Eighth Circuit Model Criminal Jury Instructions describes what is needed to convict a defendant of aiding and abetting in the commission of a crime, and provides: "[f]or you to find the defendant guilty of [the principal offense] by reason of aiding and abetting, the Government must prove beyond a reasonable doubt that all of the essential elements of [the principal offense] were committed by some person or persons and that the defendant aided and abetted the commission of that crime." The "Notes on Use" to section 5.01 states that "a person cannot aid and abet himself in the commission of a crime."

For this court to uphold Landers' conviction of aiding and abetting Jones or Payne, the evidence, viewed in the light most favorable to the conviction, must show: (1) Jones or Payne committed the principal offense – distributing or possessing with the intent to distribute crack, and (2) Landers aided or abetted Jones or Payne in

-10-

committing that principal offense. If the evidence, viewed in the light most favorable to the conviction, does not show the above two items, then no reasonable jury could have found Landers guilty, and this court must reverse Landers' conviction. United States v. Ramirez, 350 F.3d 780, 783 (8th Cir. 2003).

With regard to Jones, the facts, viewed in the light most favorable to the verdict, show: the house was leased to Jones, Landers used a cell phone that was registered to Jones, and Landers drove vehicles that were registered to Jones. Theodis Cogshell, who conducted the controlled buys of crack from Landers, testified that Landers gave him a phone number answered by a female, who Cogshell assumed was Jones. The female instructed Cogshell to call Landers at a different number. Cogshell also testified that Jones "was leaving" at the times he would go to the house.

In addition to the above facts, the DEA agent on this case, John Vannatta, testified that he did not observe Jones taking part in any drug transactions and noted that Jones had a legitimate, full time job. Vannatta also testified that "I did not see her taking part in hand-to-hand transactions." Vannatta, who had conducted surveillance on the house, also testified that he did not observe any "traffic" (which is an indication of drug transactions occurring) at the residence when Landers was not present. Cogshell testified that he personally dealt with Landers each time he bought crack and he never bought crack from Jones.

These facts, even when viewed in the light most favorable to the verdict, do not show that Jones distributed crack or possessed crack with the intent to distribute. The evidence, therefore, is insufficient to affirm Landers' conviction that he aided and abetted Jones in distributing crack or possessing crack with the intent to distribute it.

In analyzing the wrong question on this appeal – whether a reasonable jury could have found that Jones and Payne aided and abetted Landers in the distribution of crack cocaine – the majority discusses United States v. LaGuardia, 774 F.2d 317

(8th Cir. 1985). LaGuardia, however, sheds no light on the actual question we are faced with, because it presents a completely different situation than what we have.

In LaGuardia, Ramon Jorge LaGuardia and Marina Hidalgo Gato, LaGuardia's girlfriend, were both convicted of possession of cocaine with the intent to distribute and aiding and abetting in the possession of cocaine with the intent to distribute. LaGuardia, 774 F.2d at 318. The difference between this case and LaGuardia is that LaGuardia and Gato were convicted of aiding and abetting each other *and* convicted of the principal offense – possessing cocaine with the intent to distribute. This court properly affirmed LaGuardia's conviction for aiding and abetting Gato, because Gato was convicted of committing the principal offense. Here, Jones may have aided and abetted Landers, because Landers committed the principal offense – distribution or possession with the intent to distribute crack cocaine. The evidence does not show, however, that Jones committed the principal offense. Landers, therefore, could not have aided and abetted Jones.

With regard to Payne, the facts, viewed in the light most favorable to the verdict, show: Payne was present when the agents performed the "knock and talk" and allowed agents to look around the residence. Vannatta testified that Payne had answered the phone and gave the phone to Landers. Cogshell testified that Payne would normally answer the phone and would then give the phone to Landers. Cogshell testified that Payne opened the door to the house when Cogshell arrived to purchase crack during the controlled buy. Cogshell noted that in the past Payne had sat at the table where the transaction took place, because Landers and Payne had been playing "a domino game or something." Cogshell stated that Landers later moved the transactions to a back room and no one else, besides Cogshell and Landers, would go to the back room while the transactions took place.

In addition to the above facts, Cogshell testified that he personally dealt with Landers each time he bought crack and he never bought crack from Payne. Cogshell

-12-

testified that Payne's involvement in Cogshell's dealings with Landers extended to Payne "just happen[ed] to be there [at the house], open the door, answer the phone. Pretty basically, you know, that's what he did." Vannatta, who had conducted surveillance on the house, also testified that he did not observe any "traffic" at the residence when Landers was not present.

These facts do not show that Payne distributed crack or possessed crack with the intent to distribute. The evidence, therefore, is insufficient to sustain Landers' conviction that he aided and abetted Payne in distributing crack or possessing crack with the intent to distribute it.

There was no evidence presented that demonstrates that Jones or Payne distributed crack or possessed crack with the intent to distribute it. Landers, therefore, could not have aided or abetted Jones or Payne and his conviction on this charge must be reversed.

Landers is currently twenty-eight years old (born on July 7, 1977). If his conviction for aiding and abetting is overturned, Landers faces a sentence of thirty years to life imprisonment. Landers may receive the same sentence (of life imprisonment), but it is quite possible that the district court will sentence Landers to thirty years (or less now that the guidelines are advisory), and Landers could be released from prison when he is around fifty-five years old (in 2033).

A thirty-year sentence for these crimes is bad enough. To put a twenty-eight-year-old man in prison for life, without the possibility of parole, for a conviction that is not legally supportable is outrageous and unjustified.

_____