# United States Court of Appeals
### For the Eighth Circuit

---

No. 12-3152

---

United States of America

*Plaintiff - Appellee*

v.

Robin T. Brooks, Jr.

*Defendant - Appellant*

---

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

---

Submitted: April 10, 2013
Filed: May 28, 2013

---

Before LOKEN and GRUENDER, Circuit Judges, and PHILLIPS,[1] District Judge.

---

GRUENDER, Circuit Judge.

This case arises out of Robin Brooks's conviction for offenses related to a bank robbery in Des Moines, Iowa. Brooks appeals his conviction for bank robbery in violation of 18 U.S.C. § 2113(a); possession of a firearm in furtherance of a crime of

---

[1]The Honorable Beth Phillips, United States District Judge for the Western District of Missouri, sitting by designation.

violence in violation of 18 U.S.C. § 924(c); and being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 924(a)(2), 922(g)(1). Brooks contends that the district court[2] erred in several of its rulings. For the reasons stated below, we affirm.

## I. BACKGROUND

On May 13, 2011, a man entered the Tradesman Community Credit Union in Des Moines, Iowa, approached the teller, and handed her a note stating that he had a firearm and directing her to put money in an envelope. Upon reading the note, the teller placed approximately $5,900 inside one of the credit union's envelopes. Along with the money, the teller included a Global Positioning System ("GPS") tracking device that was concealed in a stack of twenty-dollar bills.

Two surveillance cameras from the credit union captured images of the robber. One video showed the man waiting in line, approaching the teller, handing her a note from an envelope, putting the envelope back in his pocket, and receiving money from her in another envelope. The other video showed the same individual entering the credit union. Both surveillance videos showed that the robber was an African-American man wearing a bright orange hat, white earphones, a dark jacket, a black shirt with a design on the front under the jacket, blue jeans, and white tennis shoes. At trial, the credit union teller identified the individual in the two videos as the robber.

Immediately after the robbery, Risha Booker, who lived near the credit union, saw a man matching the description of the robber run up the street from the direction of the credit union to a waiting vehicle. Booker testified that the man was running

_____

[2]The Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa.

with one hand holding his midsection near his waistband. Booker also testified that when the wind hit the man, she could see a bulge at his midsection. The man then entered the rear driver's side door of a white, four-door sedan that the witness said resembled an older model Buick. The car immediately drove away.

At about the same time, police and the credit union's security company, 3SI Security Systems ("3SI"), began tracking the GPS device that the teller had placed inside the envelope along with the money. The device was activated at 12:15 p.m.,[3] and the signal indicated that it initially traveled down Third Street, where Booker saw the individual leave in the white sedan. After traveling south for several blocks, the signal from the GPS device reported that the suspect was heading east through eastern Des Moines. At approximately 12:26 p.m., the GPS device signal was lost for approximately five minutes before the connection was reacquired. The signal then indicated that the device continued moving east before it stopped about two to three miles from the credit union. At about the same time, police received a report from Tonya Haskins that someone had stolen her white van. Haskins, who lived on the east side of Des Moines, testified that on the day of the robbery she went to her van to run an errand and discovered an individual bent down outside the door of the van. The individual offered her $1,000 to allow him to hide in the van. She refused and ran back to her apartment, where she called police. The individual drove away in her van.

Meanwhile, Des Moines Police Officer Chris Curtis was involved in a traffic stop with several other officers when dispatch reported a vehicle theft one block away at East 15th Street and Grand Avenue. While Officer Curtis was on his way to that location, he heard another radio call describing the stolen van. As Officer Curtis looked down the street ahead of him, he saw a van matching the description and

---

[3]The GPS device is automatically activated 30-40 seconds after someone picks it up.

pursued it. Officer Curtis saw the van pull into a parking lot several blocks ahead and parked behind it. As Officer Curtis approached the van with his weapon drawn, a second officer arrived and ran across the parking lot. The van suddenly accelerated, prompting the officers at the scene to fire several shots. The van collided with one of the patrol cars at the scene and stopped moving. The officers removed the driver, who was the only person in the van. The suspect appeared to have been shot, and the officer administering first aid noted that the man was wearing white tennis shoes, blue jeans, and a black shirt with a design on the front. Another officer, Officer David Seybert, asked the suspect his name, and the man replied that his name was "Robin."

Officer Seybert rode with the suspect in an ambulance to the hospital and observed $3,300 fall out of the suspect's pants when medical personnel removed the pants. After arriving at the hospital, the suspect stated that his last name was "Brooks." When medical staff removed the rest of Brooks's clothing, Officer Seybert observed that Brooks had a nylon belt around his chest. At the hospital, Officer Seybert recovered Brooks's clothing and discovered another $2,000 in a pocket of his pants. The remaining items of clothing included a black shirt with a design on the front, white tennis shoes, and a plain white envelope. At trial, Officer Seybert identified the defendant as the person he knew as Robin Brooks from the hospital. Haskins also identified her van at the parking lot where police arrested Brooks, and she identified Brooks as the person who stole it.

When a police officer examined the area near the van theft, he found a handgun in front of where the van had been parked. Later, police also located a white, four-door Buick LaSabre in a parking lot about two miles from the credit union. They found a bright orange hat on the rear floorboard of the car and a black trash bag in the back seat. Inside the trash bag was a dark jacket that matched the jacket worn by the robber in the surveillance video, along with a black polo shirt. Police also found a pair of eyeglasses in the backseat that matched eyeglasses worn by the robber as well as a cell phone charger. Police also recovered several items from Haskins's van,

including a cell phone, white headphones, and a bundle of money. The bundle contained four intact twenty-dollar bills—two on the top and two on the bottom—and sixty twenty-dollar bills with the center portions removed and a GPS device placed inside. The GPS device was the same one that was taken from the credit union and tracked by the security company. The police also determined that the cell phone was compatible with the cell phone charger found in the white sedan. During a warrantless search of the cell phone, Des Moines police and the FBI also discovered some photos and a video, which showed a man who resembled Brooks posing with a firearm matching the one recovered from the area where Haskins's van was stolen. In the images, the man is wearing a shirt that matches the black polo shirt police found inside the white sedan. Eight days before trial, law enforcement obtained a warrant to conduct a more thorough search of the cell phone.

Brooks was charged with bank robbery, possession of a firearm in furtherance of a crime of violence, and being a felon in possession of a firearm. He moved to suppress the photos and video recovered from the cell phone and challenged their admissibility at trial as well as the admissibility of the GPS evidence—all of which the district court denied. The court also denied Brooks's motion for a mistrial based on an alleged violation of the court's sequestration order. A jury returned guilty verdicts on all counts, and the district court denied Brooks's motion for a judgment of acquittal and sentenced him to twenty-five years' imprisonment. Brooks appeals the denial of his motion to suppress, the evidentiary rulings, and the denial of his motions for a mistrial and judgment of acquittal.

## II. DISCUSSION

### A. Admission of the Cell Phone Photos and Video

Brooks first challenges the denial of his motion to suppress the photos and video that police discovered during the search of the cell phone found inside

Haskins's stolen white van. Brooks argues that the district court erred in denying his motion to suppress because the warrantless search of the phone violated the Fourth Amendment. The Government contends that the district court properly concluded that the automobile exception justified the initial search of the phone and, even if it did not, the subsequent search warrant provided an independent source for the evidence. On review of a motion to suppress, we review the district court's factual findings for clear error and review its legal conclusions *de novo*. *United States v. Lomeli*, 676 F.3d 734, 738 (8th Cir. 2012). A warrantless search is per se unreasonable under the Fourth Amendment absent a recognized exception. *Katz v. United States*, 389 U.S. 347, 357 (1967). However, "[u]nder the so-called automobile exception to the warrant requirement, police officers may conduct a warrantless search of a vehicle and containers within the vehicle whenever probable cause exists." *United States v. Sample*, 136 F.3d 562, 564 (8th Cir. 1998) (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)). Brooks argues that the district court erred in concluding that his cell phone was a "container" for the purposes of the automobile exception as the Supreme Court envisioned traditional containers, such as suitcases or briefcases, when crafting the exception, not modern cell phones.

In this case, it is unnecessary to decide whether a cell phone is a container for purposes of the automobile exception because in any case, the subsequent warrant was an independent source for the evidence. Under the independent source doctrine, the exclusionary rule is inapplicable where the evidence was acquired through a source independent of the tainted search. *United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008). A warrant obtained after an illegal search is an independent source if: (1) "police [would] have applied for the warrant had they not acquired the tainted information," and (2) "the application affidavits support probable cause after the tainted information has been redacted from them." *Id.* at 613-14. We review the district court's conclusion on the decision to seek a warrant for clear error, *id.* at 615, and its probable cause determination *de novo*. *Id.* at 616.

Even if we assume that the initial search of the cell phone was improper, the subsequent search warrant here satisfies both of the independent source requirements. Brooks argues that the evidence police found during the initial search motivated the decision to seek a warrant. However, FBI Special Agent Grant Permenter testified that investigators sought the warrant to obtain phone call and text records to identify an accomplice. The fact that they also sought warrants for other phones in an effort to link Brooks to an accomplice supports that explanation. Special Agent Permenter further testified that the Des Moines Police Department had not previously recovered any call logs or text messages from any of those phones. Brooks argues that the eight-month delay in seeking the warrant suggests that the desire to cure the illegality of the initial search prompted the warrant request. However, Special Agent Permenter testified that the Des Moines Police Department received an additional report regarding an accomplice within the week prior to seeking the warrant and that this new information prompted the request. We do not find clear error in the district court's finding that the police would have applied for the warrant even without the information from the initial search.

The district court also properly concluded that the untainted contents of the search warrant affidavit provided probable cause. Although the search warrant application disclosed that police previously had found photos and a video on the cell phone, the details of those images were not included. *See id.* at 616-17 (holding that although a search warrant application contained both facts and details of a prior illegal search, the warrant was nonetheless valid because untainted portions supported probable cause). Further, the application stated that the phone was found in the stolen van along with currency taken from the credit union and the GPS device. It also stated that through GPS tracking, police had tracked the robber's location from the credit union to the van where Brooks and the phone were ultimately found. Des Moines Police also received information from two witnesses who provided information about a possible getaway driver. The district court properly concluded that this evidence was sufficient to establish probable cause to search the cell phone,

and, having concluded that police would have sought the search warrant even if they had not acquired the tainted information, the search warrant therefore was a valid independent source.

Brooks also argues that the district court erred in admitting into evidence the cell phone photos and video because their admission violated Federal Rules of Evidence 404(b) and 403. We review a district court's evidentiary rulings for abuse of discretion. *United States v. Brumfield*, 686 F.3d 960, 962 (8th Cir. 2012). With respect to Rule 404(b) rulings, we "will reverse only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." *United States v. Gaddy*, 532 F.3d 783, 789 (8th Cir. 2008) (quoting *United States v. Foster*, 344 F.3d 799, 801 (8th Cir. 2003)). Brooks contends that the photos and video go only to his propensity to commit crimes and not to any of the purposes permitted under Rule 404(b).

"Rule 404(b), however, applies to the admission of wrongful-act evidence that is *extrinsic* to the charged offense; the rule does not prevent admission of other wrongful conduct that is *intrinsic* to the charged offense." *United States v. Ruiz-Chavez*, 612 F.3d 983, 988 (8th Cir. 2010) (emphasis added). "Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred. Such evidence is admitted because the other crime evidence completes the story or provides a total picture of the charged crime." *Id.* (quoting *United States v. Johnson*, 463 F.3d 803, 808 (8th Cir. 2006)).

We conclude Rule 404(b) did not apply to the photos and video from the cell phone because the evidence was intrinsic to the charged crimes. Brooks was charged with bank robbery, possession of a firearm in furtherance of a crime of violence, and being a felon in possession of a firearm. Possession of a firearm is intrinsic to all of these charges. The evidence indicated that the person who robbed the credit union

had a firearm.  The robber gave the teller a note stating that he had a firearm, a witness saw him run from the credit union holding a bulge in his waistband, and GPS evidence and witnesses tied Brooks to the scene of the van theft where police later found a handgun.  That handgun resembled the firearm pictured in the photos and video taken from the cell phone, completing the Government's story that the handgun found near where the van was stolen was the firearm Brooks allegedly possessed during the robbery.  The photos and the video of a man who matches Brooks's general description, wearing a black polo shirt like the one police found in the sedan, likewise provide a total picture of the charged offense because they tend to establish that the cell phone belonged to Brooks.  Combined with the compatible charger police found in the sedan, the images complete the story by linking Brooks back to the car that police believed to be the getaway vehicle, and, in turn, linking him back to the credit union.  Thus, the cell phone photos and video are intrinsic to the crimes charged.  Accordingly, Rule 404(b) did not apply to the photos and video from the cell phone, and the district court did not abuse its discretion in admitting the evidence.

We also conclude that the admission of the photos and video did not violate Federal Rule of Evidence 403 because the probative value of the photos and video was not substantially outweighed by the potential for unfair prejudice.  The photos and video were highly probative as the firearm in the photos and video matched the firearm that police recovered from the scene of the van theft.  Brooks relies on the First Circuit's decision in *United States v. Rose*, 104 F.3d 1408 (1st Cir. 1997).  However, the First Circuit's decision in *Rose* is distinguishable.  In that case, the photo at issue showed an individual pointing a possibly loaded firearm at a friend's head, while the images in this case merely show an individual holding a firearm from different angles and moving the firearm around, making them far less likely to create unfair prejudice.

**C. GPS Evidence**

Brooks next challenges the district court's admission of evidence from the GPS tracking device. He disputes both the overall accuracy and reliability of GPS evidence generally as well as the foundation presented at trial to admit evidence from the specific device in this case. He also contends that the GPS tracking reports constituted hearsay to which no exception applied and that the admission of the GPS tracking reports and related testimony violated his rights under the Confrontation Clause. We again review the district court's evidentiary rulings for abuse of discretion. *Brumfield*, 686 F.3d at 962.

Prior to trial, Brooks challenged the overall accuracy and reliability of GPS technology under Federal Rule of Evidence 702 and argued that the Government's lay witness—a 3SI executive—possessed insufficient technical expertise to testify as to the underlying accuracy of GPS technology. The district court ruled that testimony about the general reliability of the underlying technology was unnecessary and took judicial notice of the fact that GPS technology is sufficiently reliable to satisfy Rule 702. The district court also stated that, to the extent Brooks challenged the reliability of the particular GPS device used in his case, such a challenge was better raised as a foundational objection at trial. Brooks raised such an objection.

First, under Rule 702, a witness who is qualified as an expert may testify in the form of an opinion or otherwise, if the expert possesses scientific, technical, or other specialized knowledge that would assist the trier of fact, the testimony is based on sufficient facts or data, the testimony is the product of reliable principles and methods, and the expert has reliably applied those principles and methods to the facts of the case. Fed. R. Evid. 702. However, even without expert testimony, Rule 201 permits the court to take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose

accuracy cannot reasonably be questioned." We cannot conclude that the district court abused its discretion in taking judicial notice of the accuracy and reliability of GPS technology. Commercial GPS units are widely available, and most modern cell phones have GPS tracking capabilities. Courts routinely rely on GPS technology to supervise individuals on probation or supervised release, and, in assessing the Fourth Amendment constraints associated with GPS tracking, courts generally have assumed the technology's accuracy. *See, e.g.*, *United States v. Jones*, 565 U.S. ---, 132 S. Ct. 945, 963 (2012) (Alito, J., concurring) (noting that newer "smart phones" equipped with GPS devices permit more precise tracking than older devices); *United States v. Maynard*, 615 F.3d 544, 562-64 (D.C. Cir. 2012) (discussing how prolonged GPS surveillance can provide a detailed record of a person's movements); *In re Application of U.S. for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d 526, 533 (D. Md. 2011) ("[C]urrent GPS technology would almost certainly enable law enforcement to locate the subject cellular telephone with a significantly greater degree of accuracy—possibly within ten meters or less."). Further, Brooks provides no reason to undermine the district court's conclusion beyond his mere assertion that GPS technology is "relatively new." Courts, however, have addressed the use of GPS technology for more than a decade. *See, e.g.*, *United States v. Lopez-Lopez*, 282 F.3d 1 (1st Cir. 2002).

Second, Brooks argues that the Government's witness, a 3SI account executive, lacked sufficient scientific background to lay the proper foundation for the GPS evidence from the particular device used in this case. However, the Government's witness, Mike Boecher, had been a senior account executive with 3SI for eighteen years. He had been trained by the company, he knew how the device worked, and he had demonstrated the device for customers dozens of times. *See United States v. Thompson*, 393 F. App'x 852, 857-59 (3d Cir. 2010) (holding that the district court did not err in allowing a 3SI account executive who was trained in, experienced in, and had verified the functioning of GPS devices to provide lay testimony concerning the operation of the GPS device used in that case). Further, other evidence

corroborated the accuracy of this GPS tracking device. The device was activated near the credit union just seconds after the robbery. The signal indicated that it then moved to the apartment parking lot where physical evidence and Haskins's testimony place Brooks at the time he allegedly stole the white van. Then, the signal reported that the device traveled along the same route where Officer Curtis saw the stolen van. Finally, police tracked the device and recovered it from inside a stack of money from the credit union at the same parking lot where they found Brooks. Brooks points to the brief lapse in the device's transmission as evidence of malfunction. However, as Boecher testified, objects such as tall buildings or tunnels could temporarily block the signal. Thus, we conclude that the district court did not abuse its discretion in concluding that the foundation laid in this case was sufficient.

Brooks also argues that the GPS tracking reports are inadmissible hearsay. The district court, however, did not abuse its discretion in overruling Brooks's hearsay objection as the GPS tracking reports fell under the business records exception. *See* Fed. R. Evid. 803(6). In this case, Boecher testified that as part of 3SI's regular course of business, when one of its customers activates a 3SI GPS device, the company routinely keeps the GPS data on the company server. Therefore, the court properly admitted the GPS evidence under the business records exception. *See United States v. Wood*, No. 08-CR-92A, 2009 WL 2157128, at *4 (W.D.N.Y. July 15, 2009) (holding that GPS records satisfied the requirements of the business records exception).

Finally, Brooks argues that the admission of the GPS tracking reports violated his rights under the Sixth Amendment's Confrontation Clause in light of *Crawford v. Washington*, 541 U.S. 36 (2004), *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 564 U.S. ---, 131 S. Ct. 2705 (2011). Reviewing Brooks's Confrontation Clause challenge *de novo*, *United States v. Thompson*, 686 F.3d 575, 580-81 (8th Cir. 2012), we conclude that the district court did not err in admitting the reports. As a general matter, we have held that most

-12-

business records under Rule 803(6) are non-testimonial statements to which the Confrontation Clause does not apply. *United States v. Mashek*, 606 F.3d 922, 930 (8th Cir. 2010) (citing *Crawford*, 541 U.S. at 56); *see also Melendez-Diaz*, 557 U.S. at 324. However, following the Supreme Court's decision in *Bullcoming*, we explained that certain business records still may run afoul of the Confrontation Clause if they are testimonial in nature. *See Thompson*, 686 F.3d at 581. Thus, "[i]n the Confrontation Clause context, the threshold issue is whether the record being proffered is testimonial." *Id.*

Brooks argues the reports were testimonial because "they were developed primarily for a law enforcement purpose." However, this misunderstands the Supreme Court's Confrontation Clause jurisprudence. In determining whether a statement implicates the Confrontation Clause, the crucial inquiry is whether the record was "created . . . for the purpose of establishing or proving some fact *at trial*." *Melendez-Diaz*, 557 U.S. at 324 (emphasis added); *see also Bullcoming*, 131 S. Ct. at 2720 (Sotomayor, J., concurring) ("To determine if a statement is testimonial, we must decide whether it has 'a primary purpose of creating an out-of-court substitute for trial testimony.'") (quoting *Michigan v. Bryant*, 562 U.S. ---, 131 S. Ct. 1143, 1155 (2011))). Moreover, the Court has specifically held that certain statements obtained in the course of a law enforcement investigation may nonetheless be non-testimonial. *See Bryant*, 131 S. Ct. at 1166 (holding that shooting victim's statements to police regarding his shooting were non-testimonial statements because police "solicited the information necessary to enable them to meet an ongoing emergency" (citation and internal quotation marks omitted)); *Davis v. Washington*, 547 U.S. 813, 826-27 (2006) (holding that victim's statements to a 9-1-1 operator were non-testimonial as they "were necessary to be able to resolve the present emergency" (emphasis omitted)). In this case, the GPS tracking reports similarly were used to track Brooks in an ongoing pursuit. Although the reports ultimately were used to link him to the bank robbery, they were not *created* for this purpose as Brooks contends. In other words, unlike the chemical analysis report in *Melendez-Diaz* or the blood

-13-

alcohol report in *Bullcoming*, the GPS reports were not created to establish some fact at trial. Instead, the GPS evidence was generated by the credit union's security company for the purpose of locating a robber and recovering stolen money. Therefore, the GPS reports were non-testimonial, and their admission did not violate Brooks's Confrontation Clause rights.[4]

## D. Motion for a Mistrial

Brooks argues that the district court erred in denying his motion for a mistrial based on an alleged violation of the district court's sequestration order. We will affirm a denial of a motion for a mistrial absent an abuse of discretion. *United States v. Garrett*, 648 F.3d 618, 624 (8th Cir. 2011). Brooks moved for a mistrial after a defense investigator stated that he overheard Des Moines Police Officer Tracy Rhoads discuss her testimony regarding "photographs and crime scene evidence she had processed" with Officer Seybert and Identification Technician Lynn Sprafka. Officer Seybert and Technician Sprafka testified about the crime scene later in the trial. Brooks contends that this conversation violated the district court's sequestration order preventing witnesses from discussing their testimony. He argues that this violation warranted a mistrial because "[c]rime scene evidence was crucial to the government's case."

---

[4]Additionally, we note that the GPS tracking reports in this case also are distinguishable from the chemical analysis reports in *Melendez-Diaz* or the blood alcohol analysis in *Bullcoming* because the operation of the lab machines used in those cases required specialized skill with human error possible at each step. *See Bullcoming*, 131 S. Ct. at 2711, 2714; *Melendez-Diaz*, 557 U.S. at 318-21. In contrast, the GPS tracking reports here were merely computer printouts of information generated by accepted technology. There was no human analysis, and as explained above, they did not require expert testimony for their introduction.

Federal Rule of Evidence 615 provides that witnesses may be "excluded so that they cannot hear other witnesses' testimony." Fed. R. Evid. 615. "The purpose of sequestration is to prevent witnesses from tailoring their testimony to that of prior witnesses and to aid in detection of dishonesty." *United States v. Vallie*, 284 F.3d 917, 921 (8th Cir. 2002). Here, upon learning of the potential violation of its sequestration order, the district court held an evidentiary hearing. Based on the testimony at that hearing, the district concluded that the out-of-court conversations had no substantive effect on the trial. Brooks identifies nothing in the record to suggest otherwise. Accordingly, the court denied Brooks's motion for a mistrial, and we cannot conclude that this ruling was an abuse of discretion. *See United States v. Kindle*, 925 F.2d 272, 276 (8th Cir. 1991) (holding that the district court did not abuse its discretion in denying a motion for a mistrial based on a violation of its sequestration order where the witness contact did not prejudice the defendant).

### E. Sufficiency of the Evidence

Finally, Brooks appeals the district court's denial of his motion for judgment of acquittal. "We review the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. Miller*, 698 F.3d 699, 702 (8th Cir. 2012) (quoting *United States v. Guenther*, 470 F.3d 745, 747 (8th Cir. 2006)). "[W]e will reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Espinosa*, 585 F.3d 418, 423 (8th Cir. 2009) (quoting *United States v. Thompson*, 533 F.3d 964, 970 (8th Cir. 2008)).

The jury convicted Brooks of bank robbery, possession of a firearm in furtherance of a crime of violence, and being a felon in possession of a firearm. To convict Brooks of bank robbery, the Government was required to prove (1) that Brooks took money from the credit union "by force and violence, or by intimidation"

and that (2) the credit union was federally insured. *See United States v. Pickar*, 616 F.3d 821, 825 (8th Cir. 2010) (quoting 18 U.S.C. § 2113(a)).[5] Brooks argues that (1) the individual in the surveillance video did not show a firearm; (2) the credit union teller did not identify the individual in the surveillance videos as Brooks, but only as "the robber"; (3) Haskins's identification was unreliable; (4) Risha Booker, the witness who saw the individual enter the white sedan, and officers at the scene did not identify Brooks as the robber; (5) no witness testified that the money found in the van was the same money taken from the credit union; (6) an FBI examiner testified that there was no name associated with the cell phone found in Haskins's van; and (7) no witness testified that a firearm was found in the van.

The evidence presented at trial was more than sufficient for a reasonable jury to conclude that Brooks took money from the credit union by intimidation. The surveillance video revealed that the person who robbed the credit union was wearing a bright orange hat, glasses, a dark jacket, white headphones, a black shirt with a design, blue jeans, and white shoes. Police found a bright orange hat, glasses, and a dark jacket in the sedan and found white headphones in the white van with Brooks. They also recovered a black shirt with a design, blue jeans, and white shoes from Brooks at the hospital. The surveillance video also revealed that the person who robbed the credit union took a white envelope from his pocket, removed a note from it, handed the note to the teller, and returned the folded envelope to his pocket. At the hospital, police recovered a white envelope from Brooks's blue jeans, folded in the same way shown in the surveillance video. Moreover, the prosecution played both surveillance videos for the jury. *See United States v. Wiest*, 596 F.3d 906, 910-11 (8th Cir. 2010) (concluding that although no bank employees identified defendant, jury could conclude that defendant was the bank robber based on seized clothing and surveillance tapes of robbery).

---

[5]Brooks did not challenge the second element at trial and does not do so on appeal.

At the credit union, the note that the robber gave the teller stated that he had a firearm. *See United States v. Yockel*, 320 F.3d 818, 825 (8th Cir. 2003) (holding that a written or oral demand for money combined with a direct or implied threat of harm is sufficient to establish intimidation even where a defendant does not display or make a reference to a weapon). Further, Booker testified that the robber ran from the credit union holding a bulge in his waistband, and police found a nylon band around Brooks's waist when they apprehended him. Although no firearm was found in the white van itself, police did find a firearm in the parking lot where the white van was stolen. Haskins also identified Brooks as the individual who stole her van. *See United States v. Johnson*, 519 F.3d 816, 822 (8th Cir. 2008) ("[T]he jury's credibility determinations are virtually unreviewable on appeal." (citation and internal quotation marks omitted)).

The GPS tracking device also tied Brooks to the robbery. Even setting aside the information from the GPS tracking reports, police found the GPS device with Brooks inside the stolen van approximately twenty minutes after the robbery. The device also was discovered tucked inside a stack of twenty-dollar bills in the same way that the teller described at trial. Moreover, police found Brooks with approximately $5,300 in cash, allowing a jury to infer that this money was part of the $5,900 stolen from the credit union. Police found a cell phone in the stolen van with photos and a video of a person who appears to be Brooks, allowing the jury to infer it belonged to Brooks. Further, the individual was holding a firearm that matched the one that police found near the scene of the van theft where Haskins identified Brooks. Police also found a compatible charger in a white sedan similar to the one a witness reported seeing drive away from the credit union. Based on this evidence, a reasonable jury could conclude that Brooks took money from the credit union by intimidation. The evidence was sufficient to support Brooks's conviction for bank robbery.

As to Brooks's convictions for possession of a firearm in furtherance of a crime of violence and for being a felon in possession of a firearm, Brooks argues only that the Government failed to produce sufficient evidence that Brooks possessed a firearm, a necessary element of each offense. *See* 18 U.S.C. §§ 924(c), 922(g)(1). However, as explained above, police found a firearm in the parking lot near where the van was stolen. The cell phone found in the stolen van with Brooks contained photos and video of a person resembling Brooks holding a firearm matching the one found near the site of the van theft. The nylon belt that police found around Brooks's waist suggests he had been carrying a firearm, while the note that the robber gave to the teller and the witness's statements about the bulge near the robber's waist both suggest that the person who robbed the credit union was carrying a firearm. The evidence presented at trial was sufficient for a reasonable jury to conclude that Brooks, a felon, possessed a firearm in furtherance of a crime of violence, bank robbery.

## III. CONCLUSION

For the foregoing reasons, we affirm Brooks's convictions.

———————————————