# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-KA-00342-SCT

*TOBIAS COLEMAN a/k/a TOBIAS R. COLEMAN*
*a/k/a TOBIAS RAYSHUN COLEMAN a/k/a TABIAS*
*COLEMAN a/k/a TABIAS RAYSHUN COLEMAN*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 02/01/2017 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | STANLEY ALEXANDER |
| | GERALD ALEXANDER MUMFORD |
| | MARK TYLER JACKSON |
| | KATIE NICOLE MOULDS |
| | SCOTT E. ROGILLIO |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 10/25/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.    A jury found Tobias Coleman guilty of aggravated assault for shooting a man in the head. The judge sentenced him to twenty years' imprisonment, with five years suspended. Coleman now appeals.

¶2.     We find that the trial court committed reversible error by admitting into evidence an undated, grainy[1] Facebook image taken of the defendant Tobias Coleman holding what appears to be a handgun, years before the alleged crime, through the testimony of a witness who denied ever having seen Coleman's Facebook page or the photograph in question. We reverse and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶3.     On March 30, 2014, Zacharias Blanchard was shot in the head on the grounds of Club Rock, located in Oktibbeha County just outside of Starkville, Mississippi. Blanchard was taken to the Oktibbeha County Hospital by Joanna Burchfield, who had found him lying next to her car and bleeding. Blanchard was transferred by helicopter to the University of Mississippi Medical Center in Jackson for treatment by a neurosurgeon.

¶4.     Upon returning to Starkville, Blanchard identified Tobias Coleman as the man who shot him.[2]  A grand jury charged Coleman with aggravated assault. Coleman was tried over two days in January 2017.

---

[1] "If photographs are 'grainy,' they are not clear because the many black and white or coloured dots that make up the image can be seen." *Grainy*, Cambridge Dictionary (2018), https://dictionary.cambridge.org/us/dictionary/english/grainy (last visited September 27, 2018).

[2] It is undisputed that Blanchard and Coleman had a history. Blanchard claimed at trial that Coleman previously had sought to buy a car from him, and upon realizing he could not afford it, he tried to buy the car with drugs. When Blanchard refused, Coleman tried to shoot Blanchard, but his gun jammed. Coleman disputed Blanchard's claim and stated that, although he and Coleman at one point "had beef over a female," they were no longer enemies.

2

¶5. Blanchard testified that on the night of March 30, 2014, he arrived at Club Rock under the influence of "Molly," a drug described by Blanchard as a "sexual enhancer," and alcohol. Blanchard was accompanied by his friend Stephen Thomas Jr. Once inside Club Rock, Blanchard's cousin told him that Coleman and a group of friends had trapped him in the bathroom. To take up for his cousin, Blanchard walked outside to confront Coleman. Blanchard yelled at Coleman "from a distance," but he could not recall what he said. Blanchard also could not recall whether the area outside the club was well-lit or dark, although he remembered that Coleman was wearing a black t-shirt and black jeans. Upon seeing Coleman walking towards him, Blanchard testified that he did not protest or run because "if it was [his] time, it was [his] time." Blanchard stated that Coleman had "walked upon [him]" from behind and shot him "from the back." When asked why he would walk to a dark area and turn his back on a person that Blanchard alleged had previously tried to kill him, Blanchard responded that he "respect[ed] all and fear[ed] not."

¶6. Dr. Allen Butts was the State's second witness. He examined Blanchard at the Oktibbeha County Hospital. He determined that Blanchard had been injured by a gunshot wound that had entered through his forehead, and he stabilized Blanchard prior to his transfer to Jackson.

¶7. The State's last witness was Lieutenant Brett Watson, an investigator with the Oktibbeha County Sheriff's Office. He testified that between eight hundred to one thousand people were at Club Rock on March 30, 2014. Five people, including Blanchard, had been shot that night. Investigators found shell casings from three different calibers of guns—.380,

3

.40, and .45 caliber. Lieutenant Watson testified that the different calibers of ammunition meant there likely had been multiple shooters that night. Shell casings were found in several different locations, but no DNA samples were recovered from the casings. The area where Blanchard was shot contained both .40 and .45 caliber shell casings, which, according to Lieutenant Watson, indicated that there had been more than one shooter. Lieutenant Watson and other investigators conducted interviews with the shooting victims, but most patrons had left the scene before law enforcement arrived. Investigators received names, nicknames, and tips about potential shooters. None were ever confirmed.

¶8.     Lieutenant Watson interviewed Blanchard after he returned to Starkville from Jackson. Blanchard positively identified Coleman as the shooter, having picked him out of a photograph lineup.

¶9.     After the State rested, the defense called Marcus Johnson. Johnson testified that he had been at Club Rock that night and had witnessed the shooting. According to Johnson, Blanchard and Thomas were involved in an altercation with another man. Johnson testified that both Blanchard and Thomas brandished their weapons and fired at a "dude with dreads[.]" But Johnson claimed that the man was not Coleman.

¶10.    During cross-examination, the State asked Johnson how long he had known Coleman and if he had ever seen Coleman with a gun. Johnson testified he had known Coleman several years and had never seen him with a gun. The State then asked if Johnson had ever seen Coleman's Facebook page. Johnson answered that he had never seen Coleman's Facebook page because he had many "Facebook friends." In response, the State sought to

4

introduce photographs from Coleman's Facebook page. Coleman objected, and the jury was excluded. The trial court reviewed the photographs—one showed Coleman holding a handgun; the other showed him holding a rifle. While the trial court excluded the photograph showing Coleman holding a rifle, the trial court found the other photograph to be relevant because it showed Coleman holding a black, semiautomatic pistol "in his life."

¶11. Coleman testified on his own behalf. He stated that the Facebook picture proffered by the State had been taken four years before the crime when he was still in high school. Coleman also stated that he was not in possession of a pistol the night of the shooting. Coleman denied Blanchard's allegations that he was the shooter and claimed to have fled Club Rock upon hearing the gunshots.

¶12. The jury found Coleman guilty of aggravated assault. The judge sentenced Coleman to twenty years in prison, with five years suspended. The trial court denied Coleman's motion for a new trial. Coleman now appeals.

**DISCUSSION**

¶13. On appeal, Coleman argues that the photograph, introduced through a witness who had no knowledge of the pistol and used as impeachment evidence, was irrelevant, inflammatory, and prejudicial.[3]

---

[3] Because this issue is dispositive, we need not address issues II and III. The errors assigned on appeal are as follows:

    I.      Whether a photograph recovered from Coleman's Facebook account was erroneous when the witness it was used to impeach testified to having no knowledge either of the photograph or of Coleman owning a gun.

    II.    Whether the trial court erred in limiting Coleman's cross-examination of

5

¶14. The photograph was proffered by the State to impeach the defense witness, Marcus Johnson, who testified that he had never seen Coleman with a gun before. The photograph was an undated, grainy image purportedly taken from Coleman's Facebook page. The following exchange took place between the State, the trial court, and defense counsel regarding whether photograph should be admitted:

> [The State]: My question to the witness was, had he ever been on Tobias Coleman's [F]acebook page. Those pictures were taken from his [F]acebook page. And I was going to ask him did he recognize Tobias from those photographs.[4]
>
> BY THE COURT: Okay
>
> [The State]: And also I was going to ask him has he ever seen him with a gun? That was going to be the first question. Ask [sic] the Court can see in both of those photographs, the defendant is holding a gun, both a handgun and a rifle.

¶15. In response, defense counsel objected to the admission of the photograph on the basis of relevance. The following exchange occurred between defense counsel and the trial court:

> [Defense Counsel]: Judge, if you will look at his hair on that picture, you can tell that picture is years and years old.
>
> BY THE COURT: Well, from today, sure. I mean –

Lieutenant Watson regarding his notes that designated other potential suspects in the shooting.

III. Whether the verdict was contrary to the weight of the evidence.

[4] While the issue of whether Coleman's Facebook page was authenticated properly is not before this Court on appeal, we acknowledge that at no point during the trial did the State seek to ascertain when the picture had been uploaded. *See* **Smith v. State**, 136 So. 3d 424, 433 (Miss. 2014) (holding that the court abused its discretion because the State failed to provide evidence other than the defendant's Facebook profile picture in determining whether to authenticate messages purportedly sent by the defendant through Facebook).

6

[Defense Counsel]: That should be relevant when he was carrying a pistol, too. Not that he's ever used it in his life.

BY THE COURT: What it shows is, him [Coleman] with a black-semi-automatic pistol *in his life*. And it's clearly him [Coleman].

(Emphasis added.)

¶16. We are troubled that the trial court did not apply the same logic when it refused to allow Coleman to impeach the victim, who tested positive for marijuana the night of the shooting. Coleman sought to cross-examine Blanchard regarding a toxicology screening conducted by the hospital that demonstrated that Blanchard, the only eyewitness to the shooting, tested positive for marijuana the night in question. The following exchange demonstrates inconsistent reasoning by the trial court:

[Defense Counsel]: So, would the Court be satisfied if he says he smoked weed two days prior but not that day but it was in his system? Does he need to testify that he's never smoked weed in his life?

[The State]: No, sir. That's not relevant whether or not *he's ever smoked weed in his life*.

BY THE COURT: That's exactly right. What you're seeking to do is, you're seeking to show that he was inebriated. And I understand that. You're hoping to show that he was – his recollection of things would not be good because he was impaired somewhat. Fair enough. That's allowable. But you can't do it through that document with him.

[Defense Counsel]: I understood that you should be able to impeach someone with anything.

BY THE COURT: Then you understood wrong. Who taught you evidence?

(Emphasis added.)

7

¶17.    Not only did Blanchard—the only eyewitness to the shooting—test positive for marijuana the night in question, but he also testified that he taken "Molly" and had been drinking alcohol the entire day before arriving at Club Rock. We fail to see how the trial court could at one point make the determination that, because Coleman had wielded a gun "in his life," a blurry, four-year-old photograph taken from Facebook was relevant, but that a drug test conducted on Blanchard the night of the shooting was not, because "whether or not he's ever smoked weed in his life" was immaterial.[5]

¶18.    The trial court allowed the State to continue questioning Johnson regarding the photograph, and Johnson testified that he had never seen Coleman's Facebook page. When shown the picture by the State, he identified Coleman but said he looked much younger than he had looked at the time of shooting. When the State asked Johnson what Coleman was holding, Johnson said that it "might be a BB gun" and that, if it was a gun, he could not determine what type it was. With respect to the color of the weapon, Johnson testified that it appeared to be silver.

¶19.    The State contends that the issue of whether it was proper to impeach Johnson with the photograph was not preserved by Coleman during that portion of the trial. However,

---

[5] Although not before this Court, substantial authority supports Coleman's attempted cross-examination of Blanchard with the toxicology test. *See **Brown v. State***, 690 So. 2d 276, 286 (Miss. 1996) (holding that a drug test was admissible based on the fact that it was relevant for the purpose of proving discrepancies in [the defendant]'s statement to police); *see also **Newell v. State***, 49 So. 3d 66, 73 (Miss. 2010) (finding the trial court's exclusion of a shooting victim's blood toxicology results was reversible error because the trial court's refusal to admit the toxicology screening prevented the defendant from fully presenting his defense theory); ***Byrd v. State***, 154 Miss. 742, 123 So. 867, 869 (1929) (holding that the defendant can raise the victim's intoxication to demonstrate all the conditions existing at the time and giving rise to the killing, including the victim's mental state).

immediately after Johnson testified that the gun portrayed in the photograph appeared to be silver, the following exchange took place:

| | |
|---|---|
| [The State:] | When was the last time you had your eyes checked? |
| [Johnson:] | I don't remember. |
| [The State:] | Okay. Do you have any problem with color vision? |
| [Johnson:] | No sir. |
| [The State:] | Okay. And you're telling this jury – you're telling them – |
| [Johnson:] | You're telling me that don't look silver? |
| [The State:] | No, sir, it does not. Does that gun look silver to you? |
| [Johnson:] | Yes, sir. |
| [The State]: | Your Honor, now I believe that the photographs should go into evidence for two reasons. One, it should go into evidence to – because [Johnson] stated earlier, he had never seen him with a gun, to *impeach* – . . . |

. . .

| | |
|---|---|
| [Defense Counsel]: | Your Honor, I would object to the picture, *again*. There's *a lack of foundation*. There's a *lack of relevancy*. And it's inadmissible hearsay in this matter. |
| | My client tells me that he has a picture that's unblurred [sic] that would show that the actual gun is silver. And I asked that he be allowed to produce it. |
| [The State]: | Your client can take the stand and testify to whatever he wants to. |

9

BY THE COURT: Okay. I will allow the picture to be introduced. I will at least allow you to inquire of the witness, especially in light of the fact that Mr. Blanchard [the victim] *has testified that there was a black semi-automatic pistol that your client had on that particular night*. And there was an attempt to impeach him or he was impeached or allowed to –

So I will allow this to come in.

(Emphasis added.)

¶20. Therefore, the objection by Coleman preserved the issue. *See **Carter v. State***, 722 So. 2d 1258, 1261 (Miss. 1998) (holding that a defense objection on the grounds of relevance, but not specifically on the grounds of Rule 404(b), was not procedurally barred since Rule 404(b) is an issue of relevance and the defense had objected on the grounds of relevance).

¶21. The trial transcript above also illustrates that the trial court based its evidentiary decision, in part, on Blanchard's testimony. Blanchard believed the handgun used by Coleman to be of a .40 or .45 caliber. However, when asked on cross-examination if he recalled giving a statement to the police in which he stated Coleman was carrying a .380 caliber weapon, Blanchard replied that he could not recall. Upon later taking the stand, Coleman testified that, while he was in the photograph, it had been taken four years prior to the shooting; he was holding a neighbor's weapon simply "trying to look cool."

¶22. In support of the admission of the Facebook photograph, the State relies on both ***Grant v. State***, 762 So. 2d 800, 805 (Miss. Ct. App. 2000), and ***Fraise v. State***, 17 So. 3d 160, 166 (Miss. Ct. App. 2009). In those cases, also cited by the concurrence, the Court of Appeals found that the probative value of photographs in which the defendants appeared

10

holding guns had not been outweighed sufficiently by the prejudicial effect. The State contends that each case "directly addressed" the issue before this Court; however, both cases are distinguishable.

¶23.    In *Grant*, the defendant was on trial for armed robbery and possession of a concealed weapon by a convicted felon. *Grant*, 762 So. 2d at 803. At trial, not only did two eyewitnesses testify that Grant had been holding the gun, but one eyewitness testified with particularity about the distinctive features of the gun in question. *Id.* at 805. Specifically, the witness described the gun as a ".357 [caliber] that had a black handle with molded hand grips and an emblem imprinted on the side of the handle." *Id.* at 803. Further, the gun recovered from the crime scene appeared identical to the gun documented in the photograph. *Id.* at 805. As a result, the court found the admission of the photograph to have been more probative than prejudicial. *Id.* at 806.

¶24.    Likewise, in *Fraise*, the defendant also was on trial for armed robbery and possession of a weapon by a convicted felon. *Fraise*, 17 So. 3d at 162. Three eyewitnesses to the armed robbery described the gun used by the assailant as "black *and* silver in color." *Id.* at 166 (emphasis added). As in *Grant*, the gun in the photograph recovered from the defendant's home appeared identical to the distinctive features of the gun described in the three eyewitnesses' testimony. *Id.* Therefore, the court found the photograph highly probative and held its admission had not been an abuse of discretion. *Id.*

¶25.    Unlike *Grant* and *Fraise*, here, no eyewitnesses other than the victim testified that Coleman had been the shooter. Neither the gun nor the caliber of the gun used in the shooting

11

could be ascertained from the evidence. Additionally, the color of the weapon and the exact kind of weapon depicted in the picture were disputed. Most importantly, Coleman testified that the photograph had been taken four years prior to the shooting. The holdings in *Grant* and *Fraise* are thus distinguishable.

¶26.    The concurrence also cites ***Ross v. State***, 954 So. 2d 968, 993 (Miss. 2007), in which this Court held that "Rule 401 is construed broadly in favor of admitting evidence with even slight probative value." Respectfully, however, ***Ross*** is not applicable here. First, in ***Ross***, the defendant sought to suppress the introduction of what was alleged to have been the actual murder weapon, not a grainy, undated photograph from Facebook that the testifying witness knew nothing about. *Id.* Second, an eyewitness testified that the defendant had thrown the weapon in the same ditch in which it eventually was recovered after the defendant allegedly had admitted to the murder. *Id.* Third, the weapon was a .22 caliber pistol, which not only was found in the ditch behind where the victim was killed, but also was of the same caliber as the weapon responsible for the victim's death. *Id.* Fourth, the State identified the owner of the weapon and demonstrated that the defendant had access to it. *Id.* Finally, the issue was not preserved properly by the defendant at trial and, thus, was procedurally barred from appellate review. *Id.* Even so, because Ross had been charged with capital murder, a plain-error analysis was conducted to determine whether the admission of the weapon was proper. *Id.* at 992. As such, this Court found that, *"[u]nder the circumstances*, the trial court did not abuse its discretion in admitting the pistol into evidence." *Id.* at 993 (emphasis added).

¶27. This Court is mindful of the wide discretion afforded a trial judge with respect to the admission and exclusion of evidence. But this Court has a constitutional duty to enforce the rules promulgated by this Court "fairly, evenly and predictably." *Patton v. State*, 34 So. 3d 563, 572 (Miss. 2010). The bench and bar are entitled to rely on this Court "to apply the rules no less diligently to the courts than to the lawyers and litigants." *Id.*

¶28. When prejudicial evidence is admitted that fails to link the defendant to the crime alleged, the decision of the trial court to admit such evidence constitutes an abuse of discretion. *See Walker v. State*, 878 So. 2d 913, 917 (Miss. 2004) (holding that the trial court erred in admitting a towel allegedly containing the defendant's semen because "the [State]'s failure to positively connect the semen on the towel to [the defendant] render[ed] the towel inadmissible").

¶29. Though an abuse-of-discretion standard affords great discretion to the trial judge, "[t]his Court has not hesitated to invoke its authority to order a new trial and allow a second jury to pass on the evidence where it considers the first jury's determination of guilt to be based on extremely weak or tenuous evidence[.]" *Dilworth v. State*, 909 So. 2d 731, 737 (Miss. 2005).

¶30. A factually analogous decision relating to the admission of highly prejudicial photographs is the Florida Supreme Court's ruling in *Agatheas v. State*, 77 So. 3d 1232 (Fla. 2011), in which the Florida Supreme Court considered whether the admission of photographs of a gun recovered from a backpack in the defendant's possession five years after the charged murder was error. *Id.* at 1237. The Florida Supreme Court in *Agatheas*

13

determined that the gun, which was discovered five years after the crime and which had a different caliber than the bullet casings found at the crime scene, was in no way related to the murder. *Id.*

¶31.    Moreover, the Florida Supreme Court in *Agatheas* held that the gun, along with the photographs of the gun, were not relevant to corroborate the testimony of the State's witness, the defendant's former girlfriend. *Id.* at 1239. The girlfriend had testified that the backpack in which the defendant kept his gun was missing on the night of the murder. *Id.* The Florida Supreme Court found that the gun recovered from the backpack was relevant only to demonstrate the defendant's bad character or propensity; thus, the admission of the photographs and testimony regarding the weapon was "unquestionably error." *Id.* at 1241.

¶32.    Here, we fail to understand the probative value of a blurry, undated photograph showing Coleman, years prior to the alleged crime, holding an unidentified weapon—the type and color of which were disputed. We agree with the concurrence that the photograph neither impeached Johnson's testimony regarding whether he had ever seen Coleman with a gun, nor did it corroborate Blanchard's testimony that he had been shot by a "black, semi-automatic weapon." Instead, the photograph was admitted by the trial court to show that Coleman had possessed a pistol at some point "*in his life*." Moreover, because no evidentiary connection was established by the State between Johnson's testimony, the Facebook photograph, and the weapon alleged to have been used by Coleman, the admission of such a photograph, as stated so eloquently in *Agatheas*, would be only to "demonstrate [the defendant]'s bad character or propensity." *Id.* at 1239.

14

**CONCLUSION**

¶33.   Because the trial court abused its discretion by admitting the photograph, Coleman's conviction and sentence for aggravated assault are reversed, and this case is remanded to the trial court for a new trial.

¶34.   **REVERSED AND REMANDED**.

**KITCHENS, P.J., KING, COLEMAN, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.   MAXWELL, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J.;  WALLER, C.J., AND BEAM, J., JOIN IN PART.**

**MAXWELL, JUSTICE, CONCURRING IN PART IN RESULT:**

¶35.   I agree with the majority that this case should be reversed and remanded.  But the problem here is not with the photograph itself—it is the manner in which the State introduced it.  I find no fault with the judge's general discretionary call that the photograph of Coleman brandishing a pistol was of sufficient probative value.  But I do find he erred in admitting it as impeachment evidence.  I write separately to address that notion.

**I.      Mississippi Rules of Evidence 401 and 403**

¶36.   The majority re-weighs the evidence—giving its own personal view of the photograph's evidentiary worth.  I respectfully suggest this approach is inappropriate because it cuts against the broad discretion granted trial judges when making general evidentiary calls.  "Rule 401 is construed broadly in favor of admitting evidence with even *slight* probative value."   *Ross v. State*, 954 So. 2d 968, 993 (Miss. 2007) (citation omitted) (emphasis added).  And this Court has been consistent and clear that trial judges have "sound

discretion" whether to admit potentially prejudicial evidence. ***Baldwin v. State***, 784 So. 2d 148, 158 (Miss. 2001). Indeed, "[u]nder Rule 403, the exclusion of prejudicial evidence is *permissive*"—meaning exclusion of such evidence is *not* mandated by rule. ***Ross***, 954 So. 2d at 993 (emphasis added). In other words, even in those instances in which "a trial court determines that the prejudicial effect of evidence substantially outweighs its probative value, *it is not obligated to exclude the evidence*, *but may do so at its discretion*." ***Id.*** (emphasis added).

¶37. Blanchard testified that Coleman was the shooter. But the actual pistol was not recovered, and the bullet could not be removed safely from Coleman's head for comparison with the recovered shell casings. Blanchard had already described the pistol as a black pistol bearing semiautomatic characteristics. And the judge found Coleman's pistol in the photograph to have been similar enough to Blanchard's description to be relevant and admissible. Not only is this a discretionary call on the trial judge's part, but the Court of Appeals has directly addressed similar findings at least twice.

¶38. In ***Grant v. State***, the Court of Appeals affirmed a trial judge's admission of a photograph of the defendant "wielding a gun that appears to be identical to the weapon used in the robbery . . . ." ***Grant v. State***, 762 So. 2d 800, 805 (Miss. Ct. App. 2000). Though the photograph was prejudicial, it was also highly probative. ***Id.*** In ***Fraise v. State***, the Court of Appeals again affirmed a trial judge's decision to admit a photograph of a defendant "holding a handgun almost identical to the one used in the robbery." ***Fraise v. State***, 17 So. 3d 160, 166 (Miss. Ct. App. 2009). Because the photograph depicted the defendant with a

16

gun similar to the one used in the alleged crime, the court deemed it "highly probative." *Id.*

*See also **United States v. Brooks***, 715 F.3d 1069, 1077 (8th Cir. 2013) (photographs showing defendant in possession of a firearm resembling the one used in a bank robbery were admissible because evidence was intrinsic to charged offense); ***Johnson v. United States***, 701 A.2d 1085, 1092 (D.C. 1997) (photograph of defendant holding revolver of same caliber as gun used in murder was admissible, even though photograph was more than a year old, "because the requisite link was made between the gun" depicted in photograph and the gun used in the crime).

¶39.    That this particular photograph may have been older perhaps tempered its weight some, but it did not, in the judge's view, impermissibly overshadow its probative value. Had the photograph been authenticated, introduced by, and admitted through a proper sponsoring witness during the State's case, or perhaps in rebuttal, I would have no concern with its admission.  But it was not.

## II.    Improper Impeachment

¶40.    Instead, the State tried to shoehorn the photograph in evidence after it rested.   It waited until the defense's case-in-chief and tried to cast the photograph as impeachment evidence.  This occurred after a defense witness testified he had never seen Coleman with a gun.  The problem with admitting the photograph in this posture was the fact that the witness testified he had never visited Coleman's Facebook page—the site on which Coleman was alleged to have posted the photograph.  And the witness had never previously seen the subject photograph.  In other words, the witness did not testify about anything for which the

17

photograph could be used to impeach him. So the photograph was not proper extrinsic impeachment evidence. The defendant lodged an objection to the photograph's admission as impeachment evidence, which should have been sustained. For this reason, under the facts of this particular case, I agree with the majority that reversal is appropriate.

**RANDOLPH, P.J., JOINS THIS OPINION. WALLER, C.J., AND BEAM, J., JOIN THIS OPINION IN PART.**