# United States Court of Appeals
### For the Eighth Circuit

_____

No. 13-1122
_____

United States of America

*Plaintiff - Appellee*

v.

Jose M. Diaz

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: September 27, 2013
Filed: December 9, 2013
_____

Before RILEY, Chief Judge, BYE and GRUENDER, Circuit Judges.
_____

RILEY, Chief Judge.

A jury convicted Jose M. Diaz of conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. Diaz appeals his conviction and sentence, arguing the district court[1] erred in (1) denying

---

[1]The Honorable Rodney W. Sippel, United States District Judge for the Eastern District of Missouri.

Diaz's motion to suppress, (2) refusing Diaz's duress or coercion instruction, (3) denying Diaz's motion for judgment of acquittal, and (4) denying Diaz safety valve relief at sentencing. We affirm.[2]

## I.    BACKGROUND

Diaz, a truck driver by trade, played a relatively minor role in a large drug trafficking conspiracy that began in 2007. The conspiracy involved smuggling cocaine from Mexico into the United States where it was distributed through a large network operating in several large cities. Between 2010 and 2011, law enforcement officers monitored calls among key conspirators, including Samuel Lopez and Esteban Vallejo.

In November 2010, Jose Arrendondo and Jesse Galacia arranged for a truck and driver to transport ten kilograms of cocaine from Lopez in Houston, Texas, to Vallejo in Birmingham, Alabama. Galacia and Jaime Avila hired Diaz. Diaz testified he was not involved in drug trafficking and had received the job through an acquaintance who told Diaz he would be paid $700 to transport pipe to Louisiana. Diaz testified he was initially instructed to go to a gas station to pick up the semi-tractor and trailer on November 5, 2010, but when he arrived, Galacia told him they would have to pick up the trailer at another location. Diaz and Galacia then drove the semi-tractor to the rear of a shopping center. When they stopped, two other vehicles parked next to them. Diaz testified that he asked why there was no trailer, and Galacia told him there had been "[a] change of plans."

Diaz claims he told Galacia he could not do the transport because his son was sick, but Galacia responded "he couldn't let [Diaz] go; sorry, bro." Diaz testified he was then escorted to a gas station where, as instructed, he used $500 cash the dealers gave him to pay for fuel for the semi-tractor before heading out on Highway 59

---

[2]We have appellate jurisdiction under 28 U.S.C. § 1291.

toward Alabama. According to Diaz, he "drove all night" "[v]ery afraid" he might be shot if he did not comply with the constant instructions he was receiving by phone.

At trial, Diaz's co-conspirators told a different story. Arrendondo testified the co-conspirators hired a driver (Diaz) for $10,000—$1,000 per kilogram—to deliver the drugs to Alabama, and the co-conspirators delivered the cocaine to Diaz before the trip. Arrendondo testified Diaz was aware of the drugs and that Arrendondo had never known an "unwitting courier" in his twenty years of drug dealing.

Another co-conspirator, Jimmy Solis, testified Galacia handed a red suitcase containing the drugs to Diaz in the semi-tractor. Solis further testified that Diaz drove alone in the semi-tractor and took a different route to Alabama than did the other co-conspirators. Lopez testified he never saw anyone threaten Diaz and there were no weapons involved in this trip. During the trip, Lopez made several calls to Vallejo that the police monitored. Lopez's testimony about those calls indicated Diaz was aware of the illicit nature of the trip.

On November 6, 2010, at approximately 10:15 a.m., Solis, Lopez, and Galacia arrived in Solis's truck at a Comfort Inn in Livingston, Alabama, where Vallejo had rented a room. Diaz followed in the semi-tractor at about 10:30 a.m. Solis and Galacia also rented rooms at the hotel. Based on information from Lopez's monitored calls, law enforcement had the hotel under surveillance beginning at approximately 8:30 a.m. that morning. Shortly after Diaz arrived, Drug Enforcement Administration (DEA) Task Force Officer James Wigley, the officer monitoring the hotel, watched Diaz take the red suitcase from the truck into the hotel. Solis testified that Diaz took the suitcase to Galacia's room where Solis opened the suitcase in front of Diaz and Galacia to make sure all ten kilos were there. Diaz, Galacia, and Solis then left the room to get lunch. At lunch, the men discussed Vallejo selling the cocaine and paying Diaz and Galacia so they could head back to Houston. Solis denied anyone had a gun or threatened Diaz at any time.

-3-

At approximately 10:30 p.m., Diaz left the hotel room alone to go across the street to Burger King. DEA Special Agent Patrick Wilson and three other plainclothes officers contacted Diaz outside the Burger King drive-through window, asking if Diaz would cooperate with their investigation. Diaz told the officers he took a red suitcase into the hotel, identifying the two rooms occupied by Solis and Galacia. Diaz did not say what was in the suitcase, nor did he admit to any illegal activity. Diaz also did not tell the officers he had been threatened to deliver the suitcase and admitted on cross-examination that he never saw any weapons and did not attempt to contact the police during his trip.

After a brief discussion, Agent Wilson told Diaz the officers were going to the hotel and asked Diaz if he wanted to sit in one of the unmarked police vehicles, out of sight of anyone leaving the hotel. Diaz agreed to do so. Agent Wilson testified the officers did not have their weapons drawn and never threatened Diaz or forced him to enter the police vehicle, where he remained uncuffed for approximately twenty minutes. The police vehicle was locked from the inside, but there is no evidence the officers would not have let Diaz out of the vehicle if he so requested.

After Agent Wilson spoke with Diaz, Officer Wigley performed a knock-and-talk at Galacia's room. When Officer Wigley asked for consent to search the room, Galacia pointed to the red suitcase and said, "What you're looking for is over there." Officer Wigley seized the suitcase and the ten kilograms of cocaine inside and arrested Galacia. Agent Wilson then gave Diaz his phone number and explained that Diaz might be able to get a reward for providing further information regarding illegal activity. At Diaz's request, the officers then drove Diaz to another location to be dropped off so he would not be seen leaving the police vehicle. Diaz returned to the hotel and drove the semi-tractor back to Houston.

On June 2, 2011, a grand jury indicted Diaz for conspiracy to distribute and possess with intent to distribute cocaine. Diaz moved to suppress his statements and

-4-

the cocaine, which the district court denied. At trial, Diaz submitted a proposed jury instruction on the affirmative defense of duress or coercion. After argument on the record, the district court determined the evidence did not support the instruction and refused to give it. At the close of the government's case, Diaz moved for judgment of acquittal on the grounds that the government offered no evidence to show when the cocaine was placed in the red suitcase. The district court denied the motion. At sentencing, Diaz asked the district court to apply the safety valve provision, presumably under 18 U.S.C. § 3553(f) and United States Sentencing Guidelines (U.S.S.G.) § 5C1.2(a), but the district court determined Diaz did not qualify for safety valve relief. Diaz appeals his conviction and sentence.

## II. DISCUSSION

### A. Motion to Suppress

Diaz argues the district court erred in denying his motion to suppress evidence and statements because Diaz "was in custody when he was interrogated and he was never apprised of his" rights under Miranda v. Arizona, 384 U.S. 436 (1966). "We review *de novo* the district court's legal determination about whether a defendant was in custody, and we review the court's factual findings for clear error." United States v. Vinton, 631 F.3d 476, 481 (8th Cir. 2011).

Officers must provide Miranda warnings to suspects in custody because "the inherently coercive nature of custodial interrogation 'blurs the line between voluntary and involuntary statements.'" J.D.B. v. North Carolina, 564 U.S. ___, ___, 131 S. Ct. 2394, 2401 (2011) (quoting Dickerson v. United States, 530 U.S. 428, 435 (2000)). "[W]hether a suspect is in 'custody' is an objective inquiry" that turns on two discrete questions: "'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'" Id. 564 U.S. at ___, 131 S. Ct. at 2402 (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995) (footnote omitted)); accord United States v. Perrin, 659 F.3d 718, 720 (8th Cir. 2011).

We have identified six non-exclusive factors for determining whether a suspect is in custody:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990). "The critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's freedom to depart was restricted in any way." United States v. Cowan, 674 F.3d 947, 957 (8th Cir. 2012) (quoting United States v. Martinez, 462 F.3d 903, 909 (8th Cir. 2006) (internal marks omitted)).

The district court did not err in finding Diaz was not in custody when he was interviewed by Agent Wilson and the other officers. On appeal, Diaz claims his freedom to depart was restricted because several armed law enforcement officers surrounded Diaz while he was alone in an unfamiliar setting, did not say "he was free to leave," questioned him, and placed him in a locked vehicle while they searched the hotel. The record does not support Diaz's characterization of the parking lot questioning.

Agent Wilson provided undisputed testimony that he and three other officers approached Diaz near the Burger King drive-through window, with Agent Wilson taking the lead in questioning Diaz in Spanish while the other officers remained several feet behind Agent Wilson. The officers were armed, but their weapons were

not visible to Diaz. Diaz, when approached by Agent Wilson, was not cornered by the officers and "could have gone right [to the road] or left [to the hotel] or to the rear." Agent Wilson asked Diaz if they could talk with him, and Diaz voluntarily agreed. Diaz followed behind the officers as they moved out of earshot of the Burger King drive-through for privacy. The interview occurred in a public, open location, and Diaz testified that the officers treated him "very well." Diaz appeared calm and cooperative throughout the interview, and there is no evidence the officers ever surrounded Diaz, used coercive tactics, or restrained Diaz's freedom of movement in any way. The officers did not arrest Diaz at the close of the encounter and instead thanked Diaz, encouraged him to continue his cooperation, and "wished [him] a good trip."

A reasonable person in Diaz's position "would have felt at liberty to terminate the interrogation and leave," Vinton, 631 F.3d at 481. Diaz thus was not in custody at the time of his statements to Agent Wilson.[3] The district court properly denied Diaz's motion to suppress.

## B. Jury Instruction

Diaz next contends the district court erred in denying his request to submit a jury instruction explaining the affirmative defense of duress or coercion. Diaz claims his testimony that he transported the drugs because he was "[v]ery afraid" the drug dealers would "put a bullet into [him]" if he refused or tried to escape was sufficient evidence to support a duress or coercion instruction.

"A defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." United States v. Shinn, 681 F.3d 924, 929 (8th Cir. 2012) (quoting Mathews v. United States,

---

[3]Diaz incorrectly claims he was "detained" in a patrol car following his statements to the officers. The record clearly establishes that, for his own protection, Diaz voluntarily entered the vehicle after the officers finished questioning him.

485 U.S. 58, 63 (1988) (internal marks omitted)). "We review the district court's denial of a proffered legal defense *de novo*." United States v. Young, 613 F.3d 735, 743 (8th Cir. 2010). To show he was entitled to a duress or coercion instruction, Diaz had to establish the following:

> (1) he was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) that he had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to commit a criminal act; (3) that he had no reasonable, legal alternative to violating the law; and (4) that a direct causal relationship may be reasonably anticipated between the commission of the criminal act and the avoidance of the threatened harm.

United States v. Gamboa, 439 F.3d 796, 816 (8th Cir. 2006) (quoting United States v. Jankowski, 194 F.3d 878, 883 (8th Cir. 1999) (internal marks omitted)).

The district court correctly determined Diaz failed to establish the first and third elements of a duress or coercion defense. With respect to Diaz's claimed threat, the district court found insufficient evidence that a threat had been made at all, much less a threat of death or serious bodily injury. In reaching that finding, the district court noted none of the surveillance phone records suggested the other drug traffickers had to threaten or force Diaz to transport the drugs. Diaz said he feared being shot, but Lopez and Solis testified the conspirators had no guns during the trip, and no weapons were found when Diaz's co-conspirators were searched. The district court emphasized that Diaz was alone with a phone in the semi-tractor for nine hours from Houston, Texas, to Livingston, Alabama, and never called the police or stopped to ask for help. Even after he arrived at the hotel in Alabama, Diaz was often alone, yet never made any effort to seek help or explain his situation to anyone he encountered, including when he talked with Agent Wilson at the Burger King. In fact, the first time Diaz asserted that he acted under duress was at trial.

Because Diaz had various opportunities to seek help over many hours and in many places, but elected not to do so, the district court correctly determined the facts in evidence did not warrant a duress or coercion instruction. See Gamboa, 439 F.3d at 816 (explaining the district court did not err in refusing a duress instruction where the defendant "failed to demonstrate . . . that he had a 'well-grounded apprehension of death or serious bodily injury' . . . or that he had 'no reasonable legal alternative to violating the law'" (quoting Jankowski, 194 F.3d at 883)).

### C.     Motion for Judgment of Acquittal

Diaz next proposes the district court erred in denying his motion for judgment of acquittal. In Diaz's view, his conviction cannot stand because the case against him was based on his presence at a drug deal and "wild speculation."

"We review *de novo* the denial of [Diaz's] motion for judgment of acquittal." United States v. Clark, 668 F.3d 568, 573 (8th Cir. 2012) (quoting United States v. Cook, 603 F.3d 434, 437 (8th Cir. 2010) (internal marks omitted)).

> We apply the same standard of review to the district court's ruling on a motion for judgment of acquittal as we do to a sufficiency of the evidence challenge. We view the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict. We will reverse only if no reasonable jury could have found the defendant guilty.

Cook, 603 F.3d at 437 (internal citations omitted). Diaz failed to satisfy this high standard.

Diaz analogizes his case to United States v. Pace, 922 F.2d 451 (8th Cir. 1990), and United States v. Hernandez, 301 F.3d 886 (8th Cir. 2002). In Pace, we reversed a criminal conviction because the government failed to produce sufficient evidence

the paid driver of a station wagon knowingly possessed 200 pounds of cocaine concealed in his passenger's luggage in the back of the car. See Pace, 922 F.2d at 452. At trial, the driver and his passenger both testified the driver was not aware of the cocaine. See id. at 453. In reversing the driver's conviction for possession, we noted there was no evidence the defendant explored the cargo area, opened his passenger's luggage, or knew of the "criminal nature of the trip." Id. We determined "it [was] merely conjecture to conclude [the driver] knew what those packages contained." Id. Similarly, in Hernandez, we affirmed the district court's judgment of acquittal as to the girlfriend of a drug dealer where there was no evidence the defendant was aware of the drugs found in her home and no evidence linking her to the drugs or drug dealing. See Hernandez, 301 F.3d at 890-92.

Diaz's reliance on Pace and Hernandez is misplaced. As we have said before, "this is not a case in which the government could not prove, even by inference, that the defendant was anything more than present in the vehicle or physically proximate to the contraband." United States v. Johnson, 18 F.3d 641, 648 (8th Cir. 1994). The government presented strong direct and circumstantial evidence that Diaz knowingly took part in the conspiracy as a drug courier. Diaz's co-conspirators testified Diaz was aware of the drugs, agreed to deliver them for $10,000, helped load the suitcase into the semi-tractor, transported the drugs from Houston to Livingston, brought the drugs into the room where they later were seized, and waited at the hotel all day with his co-conspirators, not only to be paid for delivering the drugs, but to carry the rest of the cash back to Houston. "[I]t was the jury's prerogative to believe" the testimony of Diaz's co-conspirators, particularly when the surveillance evidence corroborated much of that testimony. United States v. Listman, 636 F.3d 425, 430 (8th Cir. 2011).

Diaz himself testified he delivered the red suitcase from Houston to the hotel in Livingston, but claimed he did so under duress and without knowing the suitcase held any drugs. Diaz's claim of deathly fear and duress resulting from the drug dealers is materially inconsistent with his alternative claim that he was completely

-10-

ignorant of the drugs. As noted by the district court in denying Diaz's motion, the jury was not obligated to credit Diaz's testimony—either version. See United States v. Long Feather, 299 F.3d 915, 917 (8th Cir. 2002). The district court did not err in denying Diaz's motion for judgment of acquittal.

### D.    Safety Valve

Lastly, Diaz maintains the district court erred when it declined to award him safety valve relief and to reduce his offense level. The safety valve permits a district court to sentence a defendant below a statutory mandatory minimum if:

> (1) the defendant does not have more than one criminal history point; (2) the defendant did not use violence or possess a firearm in connection with the offense; (3) the offense did not result in death or in serious bodily injury; (4) the defendant was not found to be an organizer, leader, manager, or supervisor of others or to have engaged in a continuing criminal enterprise; and (5) the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense.

United States v. Sanchez-Gonzalez, 643 F.3d 626, 629-30 (8th Cir. 2011) (referring to 18 U.S.C. § 3553(f)). The only issue presented here is whether Diaz truthfully provided the government with "all information and evidence [Diaz] had concerning the offense." Id. at 630.

Diaz "has the burden to prove he qualifies for this relief, and we review for clear error the district court's findings about the completeness and truthfulness of [Diaz]'s provision of information." United States v. Aguilera, 625 F.3d 482, 488 (8th Cir. 2010). We also review "the ultimate denial of safety valve relief for clear error." United States v. Hinojosa, 728 F.3d 787, 790 (8th Cir. 2013).

Diaz did not separately proffer his knowledge to the government and relies solely on his trial testimony to support safety valve relief. We do not address the

appropriateness of such an unusual procedure.[4]  The district court concluded Diaz failed to provide completely and truthfully all of the evidence and information he had concerning the offense because his testimony was internally inconsistent and did not "hold together under a very simple common-sense analysis."  Based on Diaz's statements before and during trial, we find the district court did not commit clear error or otherwise abuse its discretion in denying safety valve relief.  See Sanchez-Gonzalez, 643 F.3d at 630.

## III.  CONCLUSION

We affirm Diaz's conviction and sentence.

———————————————

---

[4]A defendant seeking safety valve relief ordinarily engages in a proffer with the government before sentencing, and our court reviews the district court's determination of whether the proffer satisfied the defendant's obligation to provide truthful information to the government.  See, e.g., United States v. Garcia, 675 F.3d 1091, 1093-95 (8th Cir. 2012).  Diaz argues his contested trial testimony alone could satisfy § 3553(f)(5).  Because the district court did not confront this unusual procedure and did not otherwise commit clear error in denying safety valve relief, we need not address whether safety valve relief requires a defendant to engage in a proffer with the government before sentencing.