# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1137

_____

United States of America

*Plaintiff - Appellant*

v.

Anthony Laurita, also known as the user of IP Address 108.32.11.73 between
November 20, 2012 and November 27, 2012

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: November 19, 2015
Filed: May 4, 2016

_____

Before RILEY, Chief Judge, BEAM and KELLY, Circuit Judges.

_____

RILEY, Chief Judge.

Following the execution of a search warrant at a home in Uniontown, Pennsylvania, Federal Bureau of Investigation (FBI) investigators questioned Anthony Laurita at a telemarketing firm where he worked. Laurita successfully moved to suppress his statements from that interview. The United States appeals.

Having jurisdiction under 18 U.S.C. § 3731, we reverse the district court's suppression order.

## I.  BACKGROUND

On April 9, 2013, acting on lead from the Omaha, Nebraska, division of the FBI, federal agents executed a search warrant at a home in Uniontown, Pennsylvania, searching for evidence of child pornography.  The home belonged to Anthony Laurita's grandmother.  Although Laurita had been living at his grandmother's residence, only Laurita's grandmother was home when the agents conducted the search.  During the search, agents seized a desktop computer and, in pursuit of a second computer, Special Agent Patrick Howley contacted Laurita's uncle, who told him Laurita was at work at Teletech, a telemarketing firm.  After finishing the search, Special Agent Howley and Brian King, an FBI computer scientist, went to Teletech to talk to Laurita.

Around 2:00 p.m. that day, Special Agent Howley and King, neither of whom were wearing anything that would outwardly associate them with the FBI, arrived at Teletech, located in a former anchor store of a mall in Uniontown.  Without disclosing the nature of their investigation, Special Agent Howley asked a security employee at the front entrance of Teletech if he and King could have a short conversation with Laurita.  The security employee directed Special Agent Howley and King to go outside, walk around the building, and re-enter through the rear entrance where human resources was located.  Upon doing so, Special Agent Howley and King were directed to a small, rectangular conference room in the human resources area of Teletech.  Inside the room was an oval-shaped table surrounded by four or five chairs.  Next to the door was a narrow glass window.

Meanwhile, Laurita's supervisor approached Laurita, who was on a call with a customer, and handed him a note asking Laurita to come see him after the call.  Afterward, Laurita found his supervisor who, according to Laurita, told him, "'I'm

going to need you to come with me,'" and then escorted Laurita to human resources, which was a "closed door area." Once they entered the human resources area, Laurita's supervisor left, and Laurita met Special Agent Howley and King.

Special Agent Howley and King had waited only a few minutes before Laurita arrived. Special Agent Howley introduced himself and King to Laurita and they each showed Laurita their credentials. Special Agent Howley told Laurita they would "just like to talk to [him]." By Laurita's account, Laurita sat at the narrow end of the oval table, and Special Agent Howley and King sat on the left and right sides of him two to three feet away. The door was closed.

Special Agent Howley first apologized for coming to Laurita's place of employment and told Laurita they would need "only . . . maybe 10 or 15 minutes of his time . . . so that he could get back to work." Special Agent Howley explained a federal search warrant had been executed in Laurita's grandmother's home, relating to someone in the home viewing child pornography on the Internet. Special Agent Howley told Laurita he understood Laurita had a girlfriend with two young children, and his "concern" was whether Laurita had "ever act[ed] on the interests being shown" in the child pornography "on her two young children." According to Special Agent Howley, Laurita "absolutely denied" that he had acted on those interests and stated "he only viewed it," "felt bad about it," and knew "he need[ed] to seek help."

Laurita admitted he had been viewing child pornography at his grandmother's residence for approximately the past year. Laurita told the agents he had used an older computer—which was one of the computers federal agents had seized during the search—in the upstairs of his grandmother's residence near his bedroom. Laurita explained the system on that computer was incompatible with "The Onion Router" (Tor) software, which would have enabled him to access child-pornography websites through a worldwide network and concealed his identity through layers of encryption, so he accessed the pornography through finding links or connections through other

websites. At the conclusion of the interview, Special Agent Howley advised Laurita to continue working and recommended counseling "if he fe[lt] he ha[d] a problem," which Special Agent Howley said "would look very favorably in the court's eyes, [to] be proactive to address this." Special Agent Howley gave Laurita his business card, they shook hands, and Laurita exited the conference room and returned to work.

The entire conversation lasted no more than twenty minutes. Special Agent Howley never told Laurita he was under arrest, and Laurita was not arrested at the conclusion of the interview. Special Agent Howley never raised his voice, and, according to Laurita, had a "very nice demeanor," and was "soft-spoken" and "very conversational." Although Special Agent Howley primarily conducted the interview, Laurita said King "was a little bit more aggressive with his body language and . . . would scoff at some things."

On October 20, 2013, a federal grand jury charged Laurita with knowingly receiving or attempting to receive child pornography through interstate commerce in violation of 18 U.S.C. §§ 2252A(a)(2), (b)(1), and accessing with intent to view material containing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Laurita moved to suppress the statement he made to Special Agent Howley and King during the interview at Teletech. Laurita claimed Special Agent Howley and King subjected him to a custodial interrogation and failed to issue a <u>Miranda</u> warning as a procedural safeguard of his rights secured by the Fifth Amendment to the U.S. Constitution. <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

A United States magistrate judge conducted an evidentiary hearing. The magistrate judge recommended the district court deny Laurita's motion, finding Laurita was not in custody because "[a] 'reasonable person' in Laurita's position would have felt free to leave the room prior to or during the interview." The district court did not adopt the magistrate judge's findings and recommendation. Evaluating, what it called, the "six nonexclusive factors" of custody outlined in <u>United States v.</u>

Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990), the district court found the investigators subjected Laurita to a custodial interrogation without giving a Miranda warning. The district court granted Laurita's motion to suppress, and the government appeals.

## II.    DISCUSSION

"On review of a motion to suppress, we review the district court's factual findings for clear error and review its legal conclusions *de novo*." United States v. Brooks, 715 F.3d 1069, 1075 (8th Cir. 2013).

The rule under Miranda prevents the government from using statements "stemming from custodial interrogation of the defendant," unless the government has used "procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444; see Thompson v. Keohane, 516 U.S. 99, 107 (1995) (explaining "suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation"). "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam)).

To determine whether a suspect was in custody, we ask "whether, given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave or cause the agents to leave." United States v. Vinton, 631 F.3d 476, 481 (8th Cir. 2011). We have set forth six non-exclusive indicia of custody:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; [and], (6) whether the suspect was placed under arrest at the termination of the questioning.

Griffin, 922 F.2d at 1349. "The first three . . . factors may be fairly characterized as mitigating factors," and the last "three factors may be characterized as coercive factors." Id. "These factors, however, are not exclusive, and custody 'cannot be resolved merely be counting up the number of factors on each side of the balance and rendering a decision accordingly.'" United States v. Flores-Sandoval, 474 F.3d 1142, 1147 (8th Cir. 2007) (quoting United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004)). In light of the totality of the circumstances here, Laurita was not in custody.

Beginning with Griffin's first three factors, in the early stages of their interview, Special Agent Howley and King contacted Laurita at his workplace to ask a few questions. Although they did not expressly tell Laurita his participation was voluntary or that he was free to leave, nothing about the circumstances or the investigators' actions indicated otherwise. We note the district court may have placed undue importance on the first Griffin factor, commenting it "weighs heavily in the court's analysis in this case." We have emphasized that informing a suspect his participation in questioning is voluntary and that he is free to leave can be an important mitigating factor. See, e.g., United States v. Elzahabi, 557 F.3d 879, 883, 884 (8th Cir. 2009) (explaining "an express advisement that a suspect is not under arrest and that his participation is voluntary" is the "'most obvious and effective means of demonstrating that a suspect has not been taken into custody'" (quoting United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005))). As the United

States suggests, "the opposite inference"—that a suspect not being told he is free to leave during police questioning is a strong indication he was in custody—does not necessarily follow, because "the touchstone of our inquiry remains whether [Laurita] was restrained as though he were under formal arrest." United States v. Lowen, 647 F.3d 863, 868 (8th Cir. 2011); accord Beheler, 463 U.S. at 1125.

Next, the district court erred when it found "Laurita's freedom of movement was significantly constrained." None of the actions undertaken by Special Agent Howley or King restrained Laurita's freedom of movement to "the degree associated with formal arrest." United States v. Williams, 760 F.3d 811, 815 (8th Cir. 2014). Before, during, and after the interview, neither Special Agent Howley nor King handcuffed, physically or verbally restrained, or otherwise confined Laurita. Cf. United States v. Cowan, 674 F.3d 947, 957 (8th Cir. 2012) (concluding where a suspect "was detained, handcuffed, and patted down while [a detective] questioned him[,]" the suspect was in custody "because a reasonable person in [his] position would not have felt free to end the questioning and leave"). Laurita never asked to move around in the room or leave during the course of the interview. Laurita and Special Agent Howley disagreed over where Laurita was sitting inside the conference room, but Laurita had a clear pathway to the door, and, although the door was closed, there is no evidence it was locked.[1] Considering the brief duration of the questioning and the absence of any evidence of restraint, we have no difficulty concluding Laurita "possessed unrestrained freedom of movement" during the interview. Griffin, 922 F.2d at 1349.

While the investigators initiated contact with Laurita, the record fully supports the magistrate judge's finding that "Laurita voluntarily agreed to speak with Special

---

[1]We find the district court clearly erred when it found Laurita "was told that 'he needed' to accompany [his] supervisor to the locked human resources area of the office," when nothing in the record indicates this area was locked, and Laurita only described it as a "closed door area."

Agent Howley." See id. From Laurita's own account, Special Agent Howley was conversational and nice, and Laurita seems to have reciprocated by willingly explaining how he accessed child pornography despite using a computer that was incompatible with Tor. Cf. United States v. Axsom, 289 F.3d 496, 501-02 (8th Cir. 2002) (deciding that because the suspect "was extremely friendly and cooperative during the interview" and "offered to show agents which of his two computers contained child pornography," the suspect had voluntarily acquiesced to questioning).

Turning to the aggravating Griffin factors, we find none present.

First, we disagree with the district court's conclusion that Special Agent Howley employed "a ruse or deceptive strategem." In the opinion of the district court, when Special Agent Howley inquired whether Laurita had acted on an impulse depicted in child pornography, Special Agent Howley effectively accused Laurita "of the heinous crime of child sexual assault," and Special Agent Howley thereby manipulated Laurita into admitting he received and viewed "child pornography—a generally perceived lesser crime." During the suppression hearing, Special Agent Howley denied employing a ruse and explained this questioning "was a very legitimate concern regarding the two young children" of Laurita's girlfriend. After listening to Special Agent Howley's testimony, the magistrate judge concluded there was "no evidence Special Agent Howley's questions regarding Laurita's former girlfriend's children were an implied threat as Laurita contends." Cf. United States v. Mottl, 946 F.2d 1366, 1370 (8th Cir. 1991) (expressing deference in a "close" case to the trier of fact "who heard the testimony of the witnesses at the suppression hearing").

If this set of questions was designed to alert Laurita to the gravity of the situation or even to elicit inculpatory admissions, the questions nonetheless expressly related to a legitimate concern for the safety of two young children, and the questions asked were not impermissibly deceptive if at all. Even where, for instance, a police

officer's questions contain "an implicit factual assertion" admittedly designed to elicit a confession, we determined that "kind of deceit would not have acted to prevent a reasonable person from terminating the interview" and leave or ask the agents to leave. United States v. Ollie, 442 F.3d 1135, 1138, 1139 (8th Cir. 2006). The use of deception is irrelevant unless it relates to a reasonable person's perception of his freedom to depart. See id.; cf. United States v. Aldridge, 664 F.3d 705, 712 (8th Cir. 2011) (noting we have held the use of deceptive tactics—"falsely implying [officers had the suspect's] fingerprints on the weapon"—were "irrelevant to the question of custody"); United States v. Sheikh, 367 F.3d 756, 760, 762 (8th Cir. 2004) (concluding police did not employ "strong-arm or deceptive tactics" in a thirty-minute interview where a detective "may have raised his voice," accused the suspect of lying, and told the suspect his statements were "'bullshit'"); United States v. LeBrun, 363 F.3d 715, 720-21 (8th Cir. 2004) (en banc) (declaring "the purportedly coercive aspects of [a] particular interview [we]re largely irrelevant to the custody determination"); Axsom, 289 F.3d at 503 (declining to be "concerned with any moral or psychological pressures causing [a suspect] to be forthright and helpful to the agents" because "[o]ur examination only relate[d] to the restraint imposed by the agents").

Moreover, Laurita was not particularly susceptible to deception, as he is in his thirties, has an associate degree, a professional job, and prior experience being interviewed by law enforcement relating to a possession of drug paraphernalia charge. Cf. United States v. Muhlenbruch, 634 F.3d 987, 998 (8th Cir. 2011) (deciding a confession resulting from a twenty-two minute interview "at the police station" was voluntary where the suspect was in his late thirties, had prior experience with police questioning, and was "a relatively intelligent individual").

Special Agent Howley and King did not use "strong arm tactics." Griffin, 922 F.2d at 1349, 1351. Whatever tactic the district court discerned, Laurita did not feel pressured by the investigators, as he described Special Agent Howley as "very nice,"

"very conversational" and even "soft-spoken." Laurita expressed remorse for his actions and also explained to Special Agent Howley and King how he accessed the child pornography. Cf. United States v. Huether, 673 F.3d 789, 795 (8th Cir. 2012) ("The record shows [the suspect] freely answering [an officer's] questions regarding the allegations of child sexual abuse, and receipt and possession of child pornography. In fact, [the suspect] became more responsive in answering [those] questions as the interview progressed. He also cooperated with the officers in providing access to his laptop."). We have consistently concluded that methods which more closely resemble "strong arm tactics," than those alleged in this case, such as accusing a suspect of lying or officers' use of a raised voice, have little bearing on whether a suspect would have felt free to terminate an interview. Cf. United States v. Sanchez, 676 F.3d 627, 631 (8th Cir. 2012) (declaring an agent's "raised voice and his assertions that [the suspect] was lying were not coercive interview methods"); Czichray, 378 F.3d at 825, 830 (reasoning statements relating to a threat to "use the power of the FBI" to interfere with the suspect's insurance payments "would have little or no bearing on whether [the suspect's] freedom of movement was restrained for purposes of Miranda custody analysis").

In determining whether an interview was police dominated, we consider "the entire context of the questioning, including such considerations as place and length of the interrogation." Griffin, 922 F.2d at 1352. This interview lasted no more than twenty minutes and was conducted by one federal agent and one federal computer scientist. Cf. Axsom, 289 F.3d at 502 (concluding the district court erred in finding an interview was police dominated because, although nine federal agents were present in the suspect's home where the interview took place, "only two agents conducted the interview[,]" "[c]ommunication between the agents and [the suspect] consisted of two-way questioning," and photographs of the scene "reflect[ed] a more casual scene than a police dominated, inherently coercive interrogation"); Czichray, 378 F.3d at 825, 830 (ruling a "nearly seven[-]hour[]" interview where agents arrived at the suspect's home at 6:30 a.m., demanded he answer the door, instructed the suspect to

-10-

call in sick to work, and told the suspect they would "'light up his world'" if he did not cooperate was not custodial). Special Agent Howley and King were visitors to Teletech and never "took control of the site and the persons present there." United States v. Brown, 990 F.2d 397, 400 (8th Cir. 1993). The questioning took place inside a conference room at Laurita's "workplace, a location familiar to [Laurita] and a place where [he] would be comfortable and less threatened." United States v. Wallace, 323 F.3d 1109, 1113 (8th Cir. 2003) (stating an interview that took place at the suspect's workplace was not police dominated). Special Agent Howley told Laurita the interview would be short so Laurita could get back to work, and the agent kept that promise. Considering the context of the interview, it was not police dominated.

Although the district court acknowledged "the atmosphere probably could not be characterized as 'police-dominated,'" it decided that, because Laurita "was outnumbered, official credentials were shown to him, he had been ordered to the interview by a superior, and the conversation occurred in a closed room with the apparent approval of that supervisor," "a reasonable person would not have felt free to leave or to terminate the interview." We disagree. It is hardly unusual for Special Agent Howley and King—meeting Laurita for the first time and wearing nothing to indicate they worked for the FBI—to identify themselves and the purpose of the meeting. The record indicates Teletech dictated where the interview would take place. Because the subject matter of the questioning was sensitive, we think it was wise of Special Agent Howley and King to close the door.

The district court overemphasized the involvement of Laurita's supervisor. Even though the supervisor escorted Laurita to the human resources area, he was not an FBI actor or agent, and saying to Laurita, "'I'm going to need you to come with me,'" "was not an act of the FBI agents and is irrelevant in determining whether [Laurita] was in custody." United States v. Goudreau, 854 F.2d 1097, 1098 (8th Cir. 1988) (reasoning the fact that the suspect's "supervisor had instructed him to meet

-11-

with the agents at the appointed time, which [the suspect] interpreted to be an order," was "irrelevant in determining whether [the suspect] was in custody"); see also United States v. Dockery, 736 F.2d 1232, 1233, 1234 (8th Cir. 1984) (en banc) (distinguishing "'workers' voluntary obligations to their employers'"—where a suspect's employer summoned her to an interview with the FBI in a "small, vacant office" where she worked—from actions taken by law enforcement (quoting INS v. Delgado, 466 U.S. 210, 218 (1984) (explaining "when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers"))). Once Laurita and his supervisor arrived at the human resources area, the supervisor left. Laurita's supervisor never threatened Laurita, pressured him into answering the investigators' questions, or even commented to Laurita about the interview. There is no indication the supervisor had any knowledge of the nature of the investigation. It was "simply of no moment" that Laurita was "summoned to the interview by one of his supervisors at work" because such act did not "even remotely constitute[] a restraint on the freedom of movement to the degree associated with formal arrest." United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999). Consequently, the supervisor's involvement did not "tip[] the balance in favor of custody," as the district court believed.

Lastly, at the conclusion of the brief interview, Laurita was not arrested. Special Agent Howley thanked Laurita for his time, giving Laurita the agent's business card. They shook hands, and Laurita returned to work. Cf. United States v. Diaz, 736 F.3d 1143, 1149 (8th Cir. 2013) (highlighting that, rather than arresting a suspect at the conclusion of questioning, officers "instead thanked [the suspect], encouraged him to continue his cooperation, and 'wished [him] a good trip'"). Although Special Agent Howley advised Laurita that counseling or treatment would look favorable to the court, which Laurita argues implied further action would be taken against Laurita, these comments have no bearing on whether Laurita was restrained at that time or would have felt free to leave the interview. See Czichray,

-12-

378 F.3d at 829 ("It is appropriate for an investigator to advise a suspect of the potential course and consequences of a criminal investigation. . . . But the presentation of [such] information . . . does not tend to restrain a person's freedom of movement such that he should be deemed in custody."). Instead, Special Agent Howley's encouragement to seek treatment reflects the conversational, cooperative tone of the interview.

Weighing the totality of the circumstances, we agree with the magistrate judge's recommended finding that a reasonable person in Laurita's position would have felt free to terminate or leave the interview with Special Agent Howley and King. See Diaz, 736 F.3d at 1149 (holding an interview was not custodial where officers did not inform the suspect "'he was free to leave,'" but the suspect was "calm and cooperative throughout the interview, and there [was] no evidence the officers ever surrounded [the suspect], used coercive tactics, or restrained [the suspect's] freedom of movement in any way"). Laurita was not subjected to a custodial interrogation.

## III.   CONCLUSION

We reverse the district court's order granting Laurita's motion to suppress and remand for further proceedings consistent with this opinion.

KELLY, Circuit Judge, dissenting.

The district court in this case concluded, based on the evidence presented at the suppression hearing before the magistrate judge, that under the totality of circumstances a reasonable person in Laurita's position would not have felt free to terminate the interview with FBI Special Agent Howley and FBI computer scientist King. I agree that this is a close case on the issue of custody. But I disagree with the court's conclusion that certain of the district court's factual findings were clearly

-13-

erroneous and its suggestion that the district court placed undue weight on the first Griffin factor. As a result, I respectfully dissent.

In applying the non-exclusive Griffin factors to determine whether Laurita was in custody, the district court found that Laurita's freedom of movement was significantly constrained during the interview and that Agent Howley used a deceptive stratagem in conducting the interview. The court also found that, while Laurita was not arrested at the end of the interview, Agent Howley "strongly intimated that there would be criminal repercussions." On clear error review, we must affirm the district court's factual findings unless they are "unsupported by substantial evidence" or "we are left with a firm and definite conviction that a mistake has been made." Griffin, 922 F.2d at 1348. The district court's credibility determinations, made after a hearing on the merits of a motion to suppress, are "virtually unassailable on appeal." United States v. Schwarte, 645 F.3d 1022, 1028 (8th Cir. 2011).

The district court's finding that Laurita's freedom of movement was restricted during the interview was based on the facts that Laurita had been escorted to the interview by his supervisor, that the interview took place in a separate, "closed-door" area of the office, that the interview took place in a small conference room with the door closed, and that Laurita was outnumbered by Agent Howley and King. In addition, though testimony differed on this point, Laurita said that Agent Howley was seated between Laurita and the door to the conference room. Laurita did not attempt to move around the room during the interview, but there is no evidence that he would have felt free to do so, and it is not clear that there was anywhere for him to go if he had wanted to move. Cf. Williams, 760 F.3d at 815 (finding no custody where Williams was "permitted to get a glass of water and to move unsupervised through his home"). At a minimum, Laurita's freedom of movement during the interview was unclear. See Sanchez, 676 F.3d at 631 (finding that it was "unclear whether [defendant's] freedom of movement was restrained" where she was not handcuffed,

-14-

but "the interview was conducted in a small, closed room by two law enforcement officers"). Given this record, the district court's finding that Laurita's freedom of movement was significantly constrained was not clearly erroneous.

The district court's reliance on the fact that Laurita's supervisor instructed Laurita to accompany him and escorted him to the interview does warrant careful attention. The supervisor's orders were not attributable to the FBI, and therefore only carried the weight associated with Laurita's obligations to his employer. See Dockery, 736 F.2d at 1234. But that weight may nevertheless be significant; and the instructions of a manager or supervisor with meaningful control over an employee's livelihood could, as a practical matter, affect a reasonable person's perception of his freedom to leave or terminate an interview he was instructed to attend. Cf. id. (finding no custody where defendant's employer instructed her to meet with FBI agents, but defendant was advised of her right to refuse to answer questions and initiated a second interview); Goudreau, 854 F.2d at 1098 (finding no custody where defendant's supervisor instructed him to meet with FBI agents, but defendant was advised that he was free to leave at any time). This factor is not dispositive, and the district court did not treat it as such. Rather, coupled with other substantial evidence in the record, the district court's finding regarding the role of the supervisor's involvement supported the conclusion that Laurita's freedom of movement was significantly constrained.

The district court's finding that Agent Howley had used a deceptive stratagem was also supported by the evidence presented. We have held that the use of deceptive tactics in an interview is not relevant to the custody determination unless the deception would affect a reasonable person's perception of his ability to leave or terminate the interview. Ollie, 442 F.3d at 1139 (holding that falsely implying that forensic evidence incriminated defendant was not the type of deceptive stratagem that would affect defendant's perception of his ability to terminate the interview); Aldridge, 664 F.3d at 712 (same, citing Ollie); LeBrun, 363 F.3d at 720–21 (holding

-15-

that use of deceptive tactics, including falsely telling defendant that there was significant evidence against him and various other psychological ploys, was irrelevant to the custody determination). Though not all deceptive stratagems may bear on custody, the specific inclusion of "strong arm tactics or deceptive stratagems" in the Griffin factors establishes that deceptive stratagems can in fact affect the custody determination. Griffin, 922 F.2d at 1349. Here, the district court found that no reasonable person in Laurita's position would believe that he was free to leave or terminate the interview without responding to Agent Howley's questions about child abuse. The deceptive nature of this question arises from the fact that Agent Howley had no jurisdiction to act on Laurita's response, regardless of his legitimate concern for the children with whom Laurita had contact. This, in combination with the pressure imposed by this extremely serious and weighted question, could have contributed to a reasonable person's perception that he was no longer free to leave or terminate the interview.

I also disagree with the court's suggestion that the district court gave undue weight to the first Griffin factor: whether Laurita was informed that he was free to leave the interview or refuse to answer questions. It is appropriate for a court to give significant weight to whether a person was advised of his right to terminate an interview or refuse to answer questions in determining his custody status. Williams, 760 F.3d at 814 ("We have long regarded these admonitions as weighty in the custody analysis.") (quoting United States v. Perrin, 659 F.3d 718, 721 (8th Cir. 2011)). Though the presence or absence of such an advisory is only one relevant factor, it may be "powerful evidence" of how a reasonable person would perceive his freedom to end the encounter. See Czichray, 378 F.3d at 826. Moreover, the presence or absence of an advisory may affect the weight of the other factors relevant to custody: where there is no advisory, other factors may need to more clearly indicate absence of custody. See, e.g., Diaz, 736 F.3d at 1147 (no custody where suspect was not told he was free to leave, but where he was approached by law enforcement outside in a parking lot and voluntarily entered the officers' car after they questioned him); United

-16-

States v. Thomas, 664 F.3d 217, 222 (8th Cir. 2011) (no custody where suspect was not told interrogation was voluntary, but where he had requested to speak to law enforcement and interrogation took place in his mother's home); United States v. Wallace, 323 F.3d 1109, 1110–11 (8th Cir. 2003) (no custody where suspect was not told she could leave, but where she was not the target of the investigation and was questioned by a single agent in an employee lounge). I note that in LeBrun and Aldridge (as well as in Sheikh, 367 F.3d at 762), cases in which the court upheld the district court's determinations that the defendants were not in custody, the defendants were all advised of their right to leave the interview or refuse to answer questions. Aldridge, 664 F.3d at 712; LeBrun, 363 F.3d at 722; cf. Ollie, 442 F.3d at 1138 (finding custody where defendant was advised that he was not under arrest, but not of his right to terminate the interview). Here, the district court found that Laurita's freedom of movement during the interview was significantly restricted, that Laurita did not initiate the interview, that a deceptive stratagem was employed during the interview, that it was strongly implied that there would be criminal consequences of the interview, *and* that Laurita was not advised of his right to terminate the interview or refuse to answer questions.[2]  These findings were not clearly erroneous, and the

---

[2]In addition, I disagree with the court's conclusions that Laurita voluntarily acquiesced to interrogation, that the interrogation took place in a location where Laurita felt comfortable and unthreatened, and that Laurita was not especially susceptible to deceptive tactics.  The record supports the district court's specific finding that "Laurita's conduct reveals little more than an absence of resistance" to questioning.  Also supported by the record are the district court's findings that the interview took place in a separate, closed-door area of the office and that there was no evidence that Laurita was familiar, much less comfortable, with the location. Finally, the district court made no specific findings as to Laurita's particular susceptibility to deception.  A general description of his personal circumstances—including his associate's degree in graphic design, citation for possession of drug paraphernalia four years prior, and semi-skilled job—without more is insufficient to support a conclusion that he was insusceptible to expert interrogation by an FBI agent.

-17-

district court did not err in concluding that Laurita was in custody.  I would affirm the district court's order granting Laurita's motion to suppress.

_____